**Jasette WRIGHT, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 80–3291.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 22, 1982.

Decided March 11, 1982.

154

Clifford R. Williams, Detroit, Mich., for petitioner.

Patrick J. Hanley, Asst. U. S. Atty., Cincinnati, Ohio, James K. Robinson, U. S.

Atty., Michele Mayes, Asst. U. S. Atty., Detroit, Mich., James P. Morris and Robert Kendall, Jr., General Litigation & Legal Advice Section, Crim. Div., Washington, D. C., for respondent.

Before EDWARDS, Chief Judge, WEICK, Senior Circuit Judge, and NIES, Judge.*

PER CURIAM.

Jasette Wright has petitioned this Court to review the final order of deportation issued by the Immigration and Naturalization Service (INS) against her which, however, permits her to leave voluntarily, contrary to the order of the Immigration Judge, who neglected to enter in his order what he stated at the hearing that if she was found to be deportable, he would permit her to leave voluntarily. Record p. 123.

INS had issued an order against Jasette on July 19, 1976, requiring her to show cause why she should not be deported, which order contained seventeen allegations of fact, some of which factual issues were disputed, and four charges of deportability as set forth in the caption, alleging "in essence a marriage procured by fraud and one of convenience to obtain immigration benefits." P. 2, Immigration Judge's Opinion. Since the marriage was consummated by living together as husband and wife it was not fraudulent between the parties, whether it had immigration detriments is another matter.

Jasette first entered the United States as a visitor on or about April 30, 1970. She married one Frank Leak on May 25, 1971. Leak was 51 years old and a native born citizen of the United States. Jasette was only 25 years old when she married Leak. Leak, acting on behalf of his wife submitted an immediate relative visa petition on June 25, 1971, which was approved by the INS on December 3, 1971, and forwarded to the Consul in Jamaica to issue a visa

* Honorable Helen W. Nies, Judge, U. S. Court of Customs and Patent Appeals, sitting by designation.

for Jasette's permanent residence in the United States on May 25, 1972. She was then admitted in the United States as a spouse of a United States citizen on June 4, 1972, at Miami, Florida. The visa application indicated that Jasette was the mother of three children, who were living in Jamaica and conceived without the benefit of matrimony.

Jasette instituted an action for divorce in Michigan against Leak and obtained an uncontested decree of divorce on October 6, 1972. On or about November 14, 1974, Jasette submitted an application to INS for Verification of Lawful Permanent Residence of an Alien in behalf of her three children residing in Jamaica. Based on an investigation pursuant to that application, the INS issued its order against Jasette to show cause.

Of the four charges in that order, three are inextricably interrelated. First, under Sections 241(a)(1) and 212(a)(19) of the Immigration and Nationality Act of 1952 (the Act) (8 U.S.C. §§ 1251(a)(1) and 1182(a)(19)), an alien is excludable at entry for obtaining a visa by fraud or willful misrepresentation of a material fact. Second, under Sections 241(a)(2) and 241(c) of the Act (8 U.S.C. §§ 1251(a)(2) and 1251(c)), an alien is rebuttably presumed to be deportable and in violation of § 212(a)(19), *supra*, when a visa is obtained on the basis of a marriage, such marriage being entered into less than two years prior to entering the United States and terminating within two years subsequent to entry. Third, under Sections 241(a)(1) and 212(a)(20), an alien is excludable at entry if not in the possession of a valid immigration visa. (8 U.S.C. § 1182(a)(14)). Thus, where one obtains a visa on the basis of a marriage, but that marriage does not endure for the requisite period, one violates § 241(c), which constitutes the fraud alleged under § 212(a)(19), leaving one without a valid visa as required under § 212(a)(20). The fourth but conceptually distinct charge against Jasette was for entering the United States "for the purpose of performing skilled or unskilled labor" without proper certification pursuant to Sec-

tions 241(a)(1) and 212(a)(14) of the Act. (8 U.S.C. § 1182(a)(14)).

Consistent with the Immigration Judge's perception of the allegations as essentially charging a marriage of convenience, his opinion focused entirely on the alleged marriage fraud and makes no mention of the labor charge nor of any facts pertinent thereto, not even whether Jasette was employed. In his order, he stated "It is further ordered that the respondent be deported to Jamaica on the charge contained in the Order to Show Cause." That "charge" was the alleged marriage of convenience, which inextricably intertwines the first three above, but does not and could not contain the labor charge.

The Board of Immigration Appeals states in the first footnote of its opinion:

We note that the Immigration Judge's order of deportation erroneously found the respondent deportable on the "charge" contained in the Order to Show Cause, whereas four charges of deportability were set forth against her.

Further on in its opinion, the Board additionally states that "[s]ince the respondent was found to have been excludable at entry under section 212(a)(14), we find her to be ineligible for a waiver of deportability under section 241(f)." In our opinion, the Board has misspoken in its assertion that there was a finding that Jasette was in violation of the labor charge.

Had there been such a determination that Jasette violated the Act by entering the country for the purpose of performing skilled or unskilled labor, we would be obliged to reverse, for such an intent was never shown "by clear, unequivocal, and convincing evidence" as required in deportation cases or by any other evidence. *Woodby v. INS*, 385 U.S. 276, 286, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966). There was not an iota of evidence proving that she entered the country for any such purpose. Even the government admits that she had no fraudulent intent to become employed when she first entered in 1970, but came simply as a visitor to her aunt and cousins.

She reentered as a wife of a United States citizen, which she was. Her visa reveals that labor certification was "not required" and her application notes that, inter alia, the class of "aliens who seek entry to perform skilled or unskilled labor and who have not been certified by the Secretary of Labor" was inapplicable to her. On the whole the evidence showed that she never worked at all until after her divorce which was more than two years after her first entry into the States, and apparently only then because it became necessary to support herself. The Board of Immigration Appeals erred in basing its order of deportation in part upon an alleged but unsupported charge that Jasette had entered the United States for the purpose of performing skilled or unskilled labor.

Consequently, the Board erred in finding Jasette ineligible for waiver of deportation under § 241(f), the so-called "forgiveness" section, which holds that the provisions relating to deportation for fraudulent entry "shall not apply to an alien otherwise admissible at time of entry who is the spouse, parent or a child of a United States citizen". (8 U.S.C. § 1251(f)). Jasette is the parent of a United States citizen, her fourth child, born in the United States on August 13, 1976, as the Board recognized. The Board's determination of ineligibility was based solely on the mistaken notion that there had been a finding that Jasette violated the labor certification charge.

In *Chow v. INS*, 641 F.2d 1384, 1391 (9th Cir. 1981), the Court said:

> We do not believe that our holding emasculates § 241(f). While it is true that the likelihood that an alien who procures a fraudulent entry will also have a valid labor certificate is practically nil, § 212(a)(14) requires that an alien have the "purpose of performing skilled or unskilled labor" before he or she must obtain certification. Consequently, an alien who can prove to the satisfaction of the hearing officer that he or she did not enter with the "purpose" of performing skilled or unskilled labor may invoke § 241(f) if other admission requirements are met.

The Court in *Chow* remanded for further proceedings so that the petitioner would have an opportunity to prove she did not enter with the purpose to perform labor, partially based on the Board's evident confusion as to its precise basis for affirming the petitioner's deportability. *Id.* Unlike *Chow*, the Immigration Judge here did not, indeed could not, find a violation of the certification requirement. The clear weight of the evidence was to the contrary. The INS introduced no evidence at all of her purpose or intent to become employed when she entered the country and even admitted that she had no such fraudulent intent to work when she initially entered the country.[1]

1. In *Chow*, the Court stated: "In deportation proceedings, the alien bears the burden of proving eligibility for relief under § 241(f) by showing that he or she would have been 'otherwise admissible' except for the fraud or misrepresentation perpetrated by the alien's entry. *Cortez-Flores v. I. N. S.*, 500 F.2d 178 (5th Cir. 1974)." 641 F.2d at 1387. While the Court noted that procedural questions, such as the applicable standard of proof, were not before it, it was "cognizant of the difficulties in proving a negative." *Id.*, at 1391. While we too recognize problems inherent with this shifting of the burden of proof, which seems inconsistent with the high standard of "clear, unequivocal, and convincing" evidence that the government is required to present in deportation proceedings, it is especially inappropriate here, where the record is so devoid of any proof that petitioner's purpose on entering the country was to obtain employment, to place the burden on her to prove the contrary. There are a vast number of categories inclusion in which would make one "otherwise excludable," e.g. beggars, polygamists, prostitutes, etc. Must she bear the weight of disproving membership in each of these classes before § 241(f) will provide her relief?

The government attempts to rely on *Skelly v. I. N. S.*, 630 F.2d 1375 (10th Cir. 1980), for the proposition that it need not prove her intent upon entry was to work if that entry is proven to have otherwise been fraudulent. But that case is clearly inapposite "The fact is that § 241(f) does not apply to [Skelly's] case. The reason is that she has never been charged with a violation of the entry by fraud section. The charge was, of course, a lack of labor certification." *Id.*, at 1379. In fact, Skelly "waived the reading of the charges in the order to show cause and conceded that the allegations were

While the above provides sufficient grounds for setting aside the order of deportation, we also note there were enough other irregularities in the entire record to conclude that the order for deportation was not properly supported by the high standard of proof required. The standard is appropriately high. The Supreme Court itself "has not closed its eyes to the drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification." *Woodby, supra,* 385 U.S. at 285, 87 S.Ct. at 487. "And many resident aliens have lived in this country longer and established stronger family, social, and economic ties here than some who have become naturalized citizens." *Id.,* at 286, 87 S.Ct. at 488.

The Board of Immigration Appeals stated that it did "not believe that the respondent or any of the witnesses presented a very credible version of the facts". P. 3 of its opinion. In fact the testimony of Leak at the hearing was full of mistakes, inconsistencies, deliberate falsehoods and claims of misconduct leveled against INS investigators.

A review of the record indicates that Jasette and her cousins testified, with material consistency, that she and Leak had lived together, but quarreled and consequently separated. Leak substantiated this in several affidavits. In a sworn statement before an INS investigator, Leak asserted he had been married to Jasette for about 16 months, that they had lived together for about six months, that Jasette filed for divorce because they could not get along, and that they had married because they thought they could "make it" but could not. When confronted with the fact that the complaint for divorce claimed he lived with her until July 1, 1972, he reasserted with specificity that they had separated after six months of marriage, around Christmas of 1971. Such an answer was utterly inconsistent with his total denial of them ever having lived together to which he later testified at the hearing. In his affidavit Leak also asserted that he had not known of Jasette's children until told by the investigator. Leak, who graduated from high school, signed the Record of Sworn Statements, which asserted that he had read it and found the record to be true. He also initialed each of the five pages of his affidavit. (Record, pp. 198–204.)

Leak assisted his wife in obtaining her immigration visa. In the Petition to Classify Status of Alien Relative for Issuance of Immigration Visa, he identified Jasette as his wife, noted that they had lived together since they were married and that Jasette would continue to live at their same address after issuance of the visa. He again signed swearing he knew the contents of the petition and that the statements therein were true and correct. (Record, pp. 181–82.)

Nevertheless, at the hearing before the Immigration Judge Leak testified under oath that he never lived with Jasette but married her only upon the suggestion of some friends to help Jasette stay in the United States. (Curiously, these "friends" turn out to be the same individuals Jasette and her cousins contended were at least a partial cause of the disagreements and divorce.) Leak's testimony at the hearing conflicted with his sworn statements to the INS investigator so that it is clear that Leak perjured himself either at the hearing or in his sworn statements. In view of all this, it is incredible that the Board credited Leak's testimony.

Counsel at the hearing inquired of Leak about the "real" purpose of their marriage.

Q. Well, if that's the way you feel today, why didn't you tell the investigator that on December 6, 1975?

A. Well, when he was out to the house that Saturday or Sunday, I don't remember I did tell him that but he said he talked to somebody here and they said that wouldn't do.

true and correct, and that she was deportable under the charge of no labor certification." *Id.,*

at 1378.

Q. Are you telling me today, sir, that the investigator for the Immigration and Naturalization Service indicated to you what you should say and what you should not say?

A. Yeah, . . .

(Record, p. 132.)

Q. And your answer on December 6, 1975 of "we thought we could make it but we couldn't" was not correct? Is that correct?

A. Yeah, that's correct.

Q. Was that a deliberate lie to the investigator?

A. Well no, I mean, he asked me why we were married, the purpose of the marriage. So, you know, I told him, I said, well the real truth of the reason was so she could stay over here.

Q. Why isn't that in the statement, Mr. Leach [sic]?

A. Well, the investigator he didn't write that down.

(Record, p. 134.)

During the course of the hearing, Leak seemed confused as to exactly what in his affidavit was correct and true and what was not. When finally asked why he had sworn to the earlier statements, he replied "Honestly Judge, I don't know." (*Id.*, at 142).

Leak thus proved himself to be a man who lied under oath, although we cannot tell for certain on which occasions. He accused agents of the INS of directing his responses and of falsifying his testimony, although he swore to it as true, and he alleged he attempted to perpetrate a fraud on the United States. His testimony at trial was fraught with uncertainties. Linked with the other inconsistencies in the record, the proof adduced by INS certainly does not comport with the standards envisioned in *Woodby*.

Finally we note that in the Board's order of deportation in March of 1980, wherein it affirmed the judgment of the Immigration Judge, the Board sua sponte granted Jasette the privilege of voluntary departure because she had been "a person of good moral character for the past five years and has the equity of a United States citizen child," a daughter now five years old. The Board should also have related that Jasette has an equity in a house which she purchased from her earnings for several years as an employee of the Fisher Body Division of General Motors. She will lose this equity and have to take her child to Jamaica if the INS order of deportation is enforced, a very real disaster and hardship. The daughter who is a United States citizen should not be treated this way. In 1982, Jasette is still living in this country and supporting her five year old citizen daughter. With all the long delay, there is certainly nothing equitable about the order of deportation.

Actually, it was not necessary for Jasette to have sought employment to provide a home and upkeep herself and her children. Had she known that her divorce would cause her to be deported, she could have separated from her husband and applied for relief for dependent children. No one living in America starves. However, one should not be penalized for becoming self-supporting rather than dependent upon charity. It was never explained to her by anyone, including her attorney, that obtaining a divorce from her husband, would automatically require her to be deported. Her constitutional right to due process of law may even have been violated by her not having the effective assistance of counsel.

For the foregoing reasons, the petition for review is granted, the order of deportation set aside and the case remanded with instructions to dismiss the order to show cause.