1 F.3d 1244
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Dae Wan JUNG, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 92-3414.
 United States Court of Appeals, Seventh Circuit.
 Argued June 15, 1993.
Decided July 16, 1993.
 
 Before BAUER, Chief Circuit Judge, and CUMMINGS and FLAUM, Circuit Judges.
 
 ORDER
 
 1
 Dae Wan Jung appeals from the decision of the Board of Immigration Appeals ("the Board") affirming the Immigration Judge's ("the IJ") order of deportation. We affirm.
 
 
 2
 * "Matchmaker, matchmaker, make me a match."[1] Jean Cruzie took this credo of village life to trans-Pacific dimensions when she found in Cynthia Ripperda--a 21 year-old, unemployed waitress from Beckemeyer, Illinois--the perfect mate for Dae Wan Jung, her 26 year-old nephew then living in South Korea. They met through the mails and corresponded for five or six months in 1979, according to Jung. Since Jung had only a rudimentary grasp of English and Ripperda could not communicate in Korean, Aunt Jean translated their letters and interpreted their phone conversations.
 
 
 3
 Ripperda went to South Korea in June 1979. Three or four weeks after her arrival, she married Jung in a civil ceremony. Then she returned to the United States and filed a petition seeking immediate relative status for Jung, which allowed him to apply for an immigrant visa at the American consulate in Seoul. This he did. In January 1980, Jung entered the United States as a lawful permanent resident. But the romance was dead upon his arrival in Beckemeyer: Ripperda had taken up house with another man. In March 1981, Ripperda filed for divorce. Jung, then living in Collinsville, Illinois, agreed that the matter be heard expeditiously. The divorce was final on the last day of March.
 
 
 4
 Jung returned to South Korea in September 1981 in order to enter into another marriage arranged by his family. Some time thereafter Jung re-entered the United States and attempted to bring his Korean wife here, prompting the Immigration and Naturalization Service (INS) to commence deportation proceedings against him on the basis of his allegedly fraudulent marriage to Ripperda.
 
 
 5
 At the first deportation hearing, Jung testified that the marriage had been consummated and that he and Ripperda had lived together in South Korea in his parents' house. The INS then attempted to enter into evidence a 12-page, sworn statement by Ripperda taken by an INS officer. Rather than admitting the statement, the IJ postponed the hearing in order to ascertain whether Ripperda could testify in person at the hearing. At the continued hearing on May 17, 1984, Ripperda did not appear and the IJ decided that the INS should subpoena her. When the hearing reconvened, Ripperda again did not show. The INS presented the IJ with a copy of the subpoena its agents had personally served on Ripperda. In addition, the IJ noted that Ripperda had called him to report that she did not have the funds to attend the hearing. At the close of the hearing, the judge admitted the statement into evidence.
 
 
 6
 In her affidavit, Ripperda stated that she had married Jung in order to help him gain immigration status; that the marriage never had been consummated; and that she and Jung never had lived together. Moreover, she noted that Cruzie told her that she needed to go to South Korea and marry Jung so that he could enter the United States. She also recanted certain statements she had made when initially interviewed about the marriage.
 
 
 7
 The IJ found Jung deportable as charged and denied his request for voluntary departure. He found that the INS properly had relied on the statutory presumption that an alien's marriage to a United States citizen, when terminated within two years of its inception and within two years of entry into the United States, is a sham. The opinion further noted that Ripperda made her statement freely before an immigration official. Additionally, the IJ observed that despite Jung's objections to the admission of Ripperda's statement, hearsay is admissible in a deportation proceeding.
 
 
 8
 Jung appealed to the Board, which rejected his assertion that the admission of his ex-wife's statement into evidence denied his rights to due process. Finding that the INS established its case by clear, convincing, and unequivocal evidence, the Board upheld the order of deportation. This petition for review followed.
 
 II
 
 9
 * Decisions of the Board are final orders subject to judicial review in the United States courts of appeal. 8 U.S.C. Sec. 1105a(a); Wijeratne v. INS, 961 F.2d 1344, 1345-46 (7th Cir.1992). We will reverse the Board only if it has abused its discretion by making a decision that was "without a rational explanation, ... inexplicably departed from established policies, or ... rested on an impermissible basis." Vergara-Molina v. INS, 956 F.2d 682, 684 (7th Cir.1992) (citations and internal quotations omitted).
 
 
 10
 Jung is deportable because he failed to rebut the statutory presumption that his marriage to Ripperda was fraudulent in view of the immigration laws. Under the version of the Immigration and Nationality Act ("the Act") in effect at the time of his hearing in 1984, an alien was rebuttably presumed deportable if he had obtained a visa on the basis of marriage; if that marriage had occurred fewer than two years before the alien's entry into the United States; and if the marriage had been judicially annulled or terminated within two years subsequent to any entry. See Secs. 241(a)(2), 241(c) of the Act (8 U.S.C. Secs. 1251(a)(2), 1251(c) (1970)). See also Wright v. INS, 673 F.2d 153, 155 (6th Cir.1982) (per curiam). When a marriage fits this pattern, a prima facie case for deportability exists, and the alien bears the burden of proof--a heavy burden--"to establish to the satisfaction of the Attorney General that such marriage was not contracted for the purpose of evading any provisions of the immigration laws." Hamadeh v. INS, 343 F.2d 530, 532 (7th Cir.), cert. denied, 382 U.S. 838 (1965).
 
 
 11
 Jung's marriage falls squarely into the rule of Sec. 241(c). He married Ripperda on July 18, 1979. Sixth months later, on January 19, 1980, he entered the United States as a lawful permanent resident. On March 31, 1981, the marriage was terminated by an Illinois court. He, not the government, bore the burden of presenting evidence that the marriage was not phony.
 
 
 12
 At the deportation hearing, Jung described his reasons for marrying Ripperda--perhaps in order of priority: "Because I am single and, you know ... I thought going to United States and a better life, you know, better school, and I ... I was in a, you know, really in love then Cynthia." Administrative Record (hereinafter A.R.) at 104.
 
 
 13
 But asked a few minutes later if he was absolutely in love with Ripperda at the time of the marriage, Jung did not exactly wax poetic:
 
 
 14
 Q. Think it over, simple words. What did you feel about her?
 
 
 15
 A. I thought is a nice girl.
 
 
 16
 Q. All right. And what else did you feel about her?
 
 
 17
 A. And my aunt, you know, introduce, you know, her story, and I ... I thought, you know, whole and good ... and personality, and my ... my parents and they think about, you know, this strange ... strange, you know, person back in my country and the other country, right, but, you know, I thought in ... this, you know, marriage is good for.
 
 
 18
 A.R. 114. Good for what, it is not entirely clear. Moments later, Jung offered further explanation of his marital motivations:
 
 
 19
 Q. [I]n Korean custom, two young people, do they have to be in absolute love to get married, would you say?
 
 
 20
 A. I was over marriageable age.
 
 
 21
 Q. [A]fter ... your honeymoon then what happened after that? Did ... Cynthia, I assume, come back to U.S.A.?
 
 
 22
 A. Yes.
 
 
 23
 Q. Okay. Did you come back with her at the same time?
 
 
 24
 A. No. About ...
 
 
 25
 Q. Why not?
 
 
 26
 A. Because I'm waiting for an ... an visa.
 
 
 27
 A.R. 117.
 
 
 28
 Based on his observations of Jung's demeanor, the IJ did not find his testimony to be credible. In particular, the IJ did not believe Jung's testimony that the marriage had been consummated and that he and Ripperda had lived together "as man and wife". A.R. 25. A reviewing court defers to judgments about demeanor because the IJ is best situated to evaluate whether the witness is telling the truth. Lattig v. Pilliod, 289 F.2d 478, 480 (7th Cir.1961). For that reason, we refuse to "speculate" on a witness's credibility. Kulle v. INS, 825 F.2d 1188, 1193 (7th Cir.1987), cert. denied, 484 U.S. 1042 (1988). See also Gumbol v. INS, 815 F.2d 406, 412 (6th Cir.1987); Estrada v. INS, 775 F.2d 1018, 1021 (9th Cir.1985); Wing Ding Chan v. INS, 631 F.2d 978, 982 (D.C.Cir.1980), cert. denied 450 U.S. 921 (1981); Vasquez-Mondragon v. INS, 560 F.2d 1225, 1226 (5th Cir.1977).
 
 
 29
 The Board upheld the IJ, concluding that Jung failed to meet his burden of rebutting by a preponderance of evidence the presumption that his marriage was contracted for the purpose of evading the immigration laws. To order Jung deported, the IJ needed no further evidence, such as the affidavit of Ripperda.
 
 
 30
 In Dallo v. INS, 765 F.2d 581 (6th Cir.1985), the Sixth Circuit addressed a set of facts similar to the case at hand. The court concluded that Dallo's marriage would have been found bogus even without the admission into evidence of a hearsay statement by his ex-wife attesting to the fraudulent nature of the marriage:
 
 
 31
 He married Henry less [sic] than two years prior to his entry into the United States and the marriage was terminated less [sic] than two years after his entry. He was well within the statutory presumption of fraud in section 241(c) of the Immigration and Nationality Act ... and he offered no evidence to rebut the presumption. The petition for review, therefore, is obviously without merit.
 
 
 32
 Id. at 586.
 
 
 33
 So too is Jung's petition without merit. He is deportable by virtue of the Act's statutory presumption of fraud. Neither Jung's testimony at the deportation hearing nor any of his evidentiary submissions convinced the IJ otherwise. Since the deportation order is supported by reasonable, substantial, and probative evidence, the Board appropriately exercised its discretion in upholding the IJ. While the hearsay evidence perhaps gives further support to the deportation order, Jung would be deportable even if Ripperda's affidavit never existed.
 
 B
 
 34
 Even though the admission of Ripperda's statement into evidence did not dispositively affect the outcome of the hearing, we are troubled by the INS's somewhat cavalier approach to ensuring the presence of its witness. Only at the behest of the immigration judge did the INS even attempt to secure Ripperda's live testimony through the power of subpoena.
 
 
 35
 Due process is satisfied by the admission of affidavits of persons unavailable for cross-examination if the INS "establishes that despite reasonable efforts it was unable to secure the presence of the witness at the hearing." Hernandez-Garza v. INS, 882 F.2d 945, 948 (5th Cir.1989); Dallo, 765 F.2d at 586; Baliza v. INS, 709 F.2d 1231, 1234 (9th Cir.1983). From the record before us, we can hardly call the efforts of the INS, if that is what they were, reasonable. True, an immigration investigator personally served a subpoena on Ripperda on May 25, 1984 (at the urging of the immigration judge, not on the INS's initiative). But this is as far as the INS went. It took no steps to enforce the subpoena.
 
 
 36
 At oral argument, the court asked counsel for the INS what it had done to ensure Ripperda's presence. "They asked her to come in," responded the INS. The court pointed out that Ripperda declined this request because she could not afford to go to the hearing, noting further that the INS could have subsidized her trip. In response, the INS speculated that the unavailability of funds up-front, prior to the hearing, may have discouraged Ripperda from traveling.
 
 
 37
 This "justification" is unacceptable in two respects. First, no legal authority of which we are aware prevents the INS from reimbursing witnesses for their travel expenses and making it clear to reluctant witnesses that they can and will be compensated. Second, if a witness is so crucial to the government's case, it should make arrangements to use funds at its disposal to pay the witness in advance. Perhaps the INS calculated that it need not have taken either step because Ripperda's testimony was not so crucial to its case; Jung's inability to overcome the statutory presumption against him would result in his deportability. But we doubt that the government made such a confident prediction because it aggressively sought to submit the affidavit into evidence.
 
 
 38
 If the INS wanted the immigration judge to consider Ripperda's testimony, we wish that it would have been more aggressive in its pursuit of Ripperda herself. Fortunately for the INS, this case does not turn on the admission of the hearsay statement. We have grave reservations about the INS's half-hearted attempts to enforce the subpoena[2] and sincerely doubt whether the government would have prevailed in this case--in any case under similar circumstances--had the petitioner overcome his burden and the INS attempted to meet its burden of proof with but a piece of paper, the admission of which likely would have denied Jung his statutory and constitutional rights. If the affidavit had been of greater significance to this case, we would have been forced to act on our dissatisfaction with the level of fundamental fairness and due process observed in the deportation proceedings. The government's performance in producing its witness was much more lackadaisical than reasonable. Such slipshod methods should not and will not be tolerated.
 
 
 39
 AFFIRMED.
 
 
 
 [1]
 Sheldon Harnick, "Matchmaker, Matchmaker", from Fiddler on the Roof (1963)
 
 
 [2]
 While the immigration judge conscientiously continued the proceeding on two separate occasions in order to afford the INS opportunities to produce Ripperda for live testimony, the judge could have but did not take additional steps that would have guaranteed a fundamentally fair hearing for Jung. If a witness neglects or refuses to appear and testify as directed by the subpoena issued by an immigration judge, the judge shall request the district director, for the district where the subpoena was issued, to request the United States attorney to report the matter to the United States District Court and ask the Court to issue an order requiring the witness to appear and testify. 8 C.F.R. Sec. 287.4(d). This the judge did not do. Perhaps the immigration judge had determined that Ripperda's statement was superfluous to the case because Jung's testimony lacked credibility and would fail to overcome the statutory presumption of deportability. But if that were the case, then perhaps the immigration judge need not have admitted the hearsay affidavit at all