**GUO CHUN DI, Petitioner,**

**v.**

**William J. CARROLL, District Director of the United States Immigration and Naturalization Service, Washington District; and David L. Milhollan, Director of the Executive Office for Immigration Review and Chairman of the Board of Immigration Appeals, Respondents.**

**No. CV 93–1377–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 14, 1994.

Timothy S. Burgett, John W. Polk, Philip K. Lau, Baker and McKenzie, Washington, DC, for petitioner.

Helen Fahey, U.S. Atty., Theresa Carroll Buchanan, Asst. U.S. Atty., Alexandria, VA, Kristin A. Cabral, David M. McConnell, Office of Immigration Litigation, Civil Div., U.S. Dept. of Justice, Washington, DC, for respondents.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

This petition for a writ of habeas corpus presents the question whether aliens who have a well-founded fear that they will be arrested and involuntarily sterilized because they oppose and refuse to obey their country's coercive population control policies may be granted asylum on the ground of "persecution * * * on account of ... political opinion." 8 U.S.C. § 1101(a)(42)(A) (hereafter "the Act"). Imbedded in this general question are subsidiary, predicate questions concerning the validity and effect, if any, of various administrative efforts to construe the Act. Finally, because the Court concludes that the cacophonous administrative record merits no judicial deference, the central question presented is whether the Act, properly construed, extends asylum to an alien who fled his country to avoid arrest, imprisonment and involuntary sterilization because he and his wife oppose and will not obey their country's policy of coercive population control through involuntary sterilization and abortion.

### II.

#### 1. *Petitioner's History*

Petitioner, Guo Chun Di, is a 28 year old citizen of the Peoples Republic of China ("PRC"), who fled his country aboard the vessel *Golden Venture,* which ran aground in New York harbor on June 6, 1993. When this occurred, petitioner was one of many aliens on the ship who jumped overboard and attempted to swim to shore. While still in the water, petitioner was rescued, and then detained and taken into custody by the Immigration and Naturalization Service ("INS"). The INS charged petitioner with attempting to enter the United States without valid documents in violation of federal law. Petitioner, who asserted a claim for political asylum under the Act, was transferred to a state detention facility in Winchester, Virginia, pending completion of an exclusion and deportation proceeding initiated against him by INS pursuant to 8 U.S.C. § 1226.

At a hearing before an immigration judge in Arlington, Virginia, petitioner testified through an interpreter and described the events that led to his decision to flee his country. Specifically, he testified that following the birth of his first child, government family planning officials ordered his wife to

report to a local hospital for a sterilization operation. Strongly opposed to this involuntary sterilization, his wife fled from the village in which they lived to relatives in a distant city. At this point, government planning officials then sent petitioner a similar notice to report to a local hospital for a sterilization operation. Firmly opposed to the government-ordered involuntary sterilization, petitioner also fled his home village and joined his wife in the city. While living in the city, petitioner received word from relatives living in his home village that government officials had visited his home, confiscated his and his wife's personal property and then destroyed the portion of the house in which petitioner and his wife had lived. On receiving this information, petitioner decided to leave the PRC and come to the United States. In his own words, his reasons for doing so were as follows:

> Q. And can you say exactly why you wanted to leave China?
>
> A. Because I feared that China has no freedom. Because I only have one child, I want to have two more child, but they don't let me have. If .. I afraid that if they find me, they will took me to get sterilize operation.
>
> Q. Why did you want to come to the United States instead of some other country?
>
> A. Because I heard about the U.S.A. is a freedom country.
>
> Q. What do you think would happen to you if you were sent back to China?
>
> A. They ... first they will sent me to the jail and then they will force me to do the sterilize [sic] operation.

The immigration judge found petitioner truthful and accepted petitioner's account of the facts and circumstances that led to petitioner's decision to flee government persecution in the PRC and to come to America.[1] Even so, however, the immigration judge ruled that petitioner (i) was "not a 'refugee' as that term is defined by law," (ii) was therefore ineligible for asylum, and (iii) was subject instead to exclusion and deportation. In reaching this conclusion, the immigration judge relied on *Matter of Chang*, Int.Dec. 3107, 1989 WL 247513 (BIA 1989), a decision of the Board of Immigration Appeals ("BIA") purporting to hold that government persecution in furtherance of a coercive population control policy that includes involuntary sterilization does not constitute "persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).[2] Petitioner appealed this ruling to the BIA on the ground that certain federal regulations had invalidated *Chang*. The Board rejected petitioner's appeal after noting that *Chang* was still valid controlling administrative precedent, as the regulations petitioner cited "were not codified and have no force or effect." This petition for a writ of habeas corpus followed.

### 2. Regulatory History

*Chang* issued in May 1989. Almost a year earlier, the Department of Justice had issued policy guidelines to the INS designed to ensure that asylum could be granted to persons who could show well-founded fear of government persecution stemming from the PRC's involuntary sterilization and abortion programs.[3] INS did not implement these guide-

---

1. The immigration judge, in his opinion, noted that the first account petitioner gave INS, as translated by an interpreter, suggested that petitioner had already been involuntarily sterilized and that his wife had already been required to undergo an abortion. Noting that this account was different from that given at the immigration hearing, the immigration judge acknowledged that the conflict might well be the result of the absence at the first interview of an interpreter qualified in petitioner's particular dialect (Fuzhov). Despite this conflict, probably attributable to translation error, "the Immigration Court credited the allegations made by the Petitioner in his testimony." *In the Matter of Guo, Chun Di,*

(A 72 762 107), Written Decision and Order of the Immigration Judge, p. 8 (Aug. 18, 1993).

2. Because the alien in *Chang* failed to establish the factual predicate of a well-founded fear of persecution, the holding with respect to involuntary sterilization is arguably *dictum*. *See Matter of Chang*, Int. Dec. 3107, 1989 WL 247513, 1989 BIA LEXIS 13, *15.

3. The Guidelines were described in the Congressional Record as follows:

> DOJ guidelines, noting that the PRC government views such defiance [i.e., opposition to

lines and the Board in *Chang* expressly stated it was not bound by the guidelines.

Soon after the May 1989 *Chang* decision, efforts were made in Congress to overturn it. These efforts culminated in the Armstrong—DeConcini Amendment to the Emergency Chinese Immigration Relief Act of 1989, H.R. 2712, which was drafted and offered for the express purpose of overruling *Chang*. Sponsors of the amendment expressed frustration that the Attorney General's guidelines were not implemented by the INS. By November 1989, the Senate had unanimously passed the amendment and the House, by a substantial margin, had voted to concur in the amendment. While in agreement with the amendment, President Bush vetoed the Emergency Chinese Immigration Relief Act of 1989, citing concerns with other portions of the bill. *See* Memorandum of Disapproval for the Emergency Chinese Immigration Relief Act of 1989, *Weekly Comp.Pres.Doc.* 1853–54 (Nov. 30, 1989). The House of Representatives voted to override the veto, but the Senate failed by five votes to do so. Several Senators voting to uphold the veto noted that they did so in reliance on the President's assurances that administrative action would be taken to ensure that *Chang* was reversed.[4] Faithful to his assurances and reflecting his agreement with the amendment, if not the entire bill, President Bush issued instructions to the Attorney General to take appropriate action.

Responding to this instruction, the then Attorney General, in January 1990, promulgated an interim rule amending the existing regulations governing asylum and withholding of deportation (hereinafter "January 1990 Interim Rule"). Specifically, the January 1990 Interim Rule amended then-existing C.F.R. § 208.5 to provide that:

1. Aliens who have a well-founded fear that they will be required ... to be steri-

lized because of their country's family planning policies may be granted asylum on the ground of persecution on account of political opinion.

2. An applicant who establishes that the applicant (or the applicant's spouse) has refused ... to be sterilized in violation of a country's family planning policy, and who has a well-founded fear that he or she will be required ... to be sterilized or otherwise persecuted if the applicant were returned to such country may be granted asylum.

Approximately three months after the promulgation of the January 1990 Interim Rule, an executive order issued underscoring the substance of the January 1990 Interim Rule. The executive order stated:

The Secretary of State and the Attorney General are directed to provide for enhanced consideration under the immigration laws for individuals from any country who express a fear of persecution upon return to their country related to that country's policy of forced abortion or coerced sterilization, as implemented by the Attorney General's regulation effective January 29, 1990.

The next chapter in this regulatory saga occurred in July 1990, when the Attorney General published a final rule setting forth extensive changes in the regulations pertaining to asylum and withholding of deportation. *See* 55 Fed.Reg. 30674 (July 27, 1990) (hereinafter "July 1990 Rule"). The July 1990 Rule inexplicably made no mention whatever of the January 1990 Interim Rule, nor did it refer in any way to the issue of asylum for persecution on the basis of opposition to coercive family planning policies, including policies involving involuntary abortions and sterilizations. Still, this July 1990 Rule rewrote, among other things, the sections of the Code of Federal Regulations that were ostensibly

---

involuntary sterilization] as an act of "political dissent," state that "a finding of the requisite well-founded fear of persecution under these circumstances is reasonable." This constitutes persecution for "political opinion" under the Immigration Act and would result in a grant of asylum.
135 Cong.Rec. S8244 (daily ed. July 19, 1989).

**4.** Thus Senator Grassley, among others, noted that:
"Because I believe that the President's Executive order not only extends protections equal to but greater than H.R. 2712 [the Emergency Relief Act with the Armstrong–DeConcini Amendment], I am in support of sustaining the President's veto...."
136 Cong.Rec. S376 (daily ed. Jan. 25, 1990).

amended by the January 1990 Interim Rule so that when the Code of Federal Regulations was published in January 1991, the January 1990 Interim Rule had quite simply and remarkably vanished without a trace or explanation.

The final chapter in this regulatory saga opened in January 1993, when the then Attorney General signed a final rule (hereinafter "January 1993 Rule") that essentially reiterated the January 1990 Interim Rule overruling *Chang*. The January 1993 Rule took explicit account of the comments previously received concerning the January 1990 Interim Rule and then amended the regulations in essentially the same way as they had been amended by the January 1990 Interim Rule.[5] Included in the explanatory comments to the January 1993 Rule is the statement that "[o]ne effect of this rule is to supersede ... *Matter of Chang*."

The January 1993 Rule, signed by the Attorney General in the waning days of the Bush Administration, was sent to the Federal Register, where it was made available for public inspection and scheduled for a Janu-

ary 25 publication. President Clinton was inaugurated on January 22. Immediately thereafter, his proposed Director of the Office of Management and Budget[6] issued a directive prohibiting publication of any new regulations not approved by an agency head appointed by President Clinton. This directive further ordered that all regulations previously submitted for publication be withdrawn from the office of the Federal Register pending approval by a Clinton-appointed agency head. Pursuant to this directive, the Acting Assistant Attorney General sent a memorandum to the Office of the Federal Register requesting the withdrawal of, among others, the January 1993 Rule. Acting on this request, officials at the Office of the Federal Register withdrew the January 1993 Rule from the Federal Register. It has not been resubmitted or published.

### 3. *Proceedings to Date*

■ The filing of the petition, by itself, did not halt INS deportation and exclusion proceedings against petitioner.[7] Accordingly, soon after the filing of the petition, petitioner filed a request for immediate and preliminary

---

5. The January 1993 Rule provides, in pertinent part, as follows:

§ 208.13 Establishing refugee status; burden of proof.

\* \* \* \* \* \*

(b) \* \* \*

(1) \* \* \*

(i) An applicant (and the applicant's spouse, if also an applicant) shall be found to be a refugee on the basis of past persecution on the basis of political opinion if the applicant establishes that, pursuant to the implementation by the country of the applicant's nationality or last habitual residence of a family planning policy that involves or results in forced abortion or coerced sterilization, the applicant has been forced to abort a pregnancy or to undergo sterilization or has been persecuted for failure or refusal to do so, and that the applicant is unable or unwilling to return to, or to avail himself or herself of the protection of, that country because of such persecution.

\* \* \* \* \* \*

(2) \* \* \*

(ii) An applicant (and the applicant's spouse, if also an applicant) shall be found to be a refugee on the basis of a well-founded fear of persecution on account of political opinion if the applicant establishes a well-founded fear that, pursuant to the implementation by the country of the applicant's nationality or last

habitual residence of a family planning policy that involves or results in forced abortion or coerced sterilization, the applicant will be forced to abort a pregnancy or undergo sterilization or will be persecuted for failure or refusal to do so, and that the applicant is unable or unwilling to return to, or to avail himself or herself of the protection of, that country because of such fear.

6. At the time he issued this Directive, the proposed OMB Director had not yet received Senate confirmation. In addition, this directive is somewhat unusual in that it emanated from a designated agency head, rather than from the President himself. President Reagan issued a similar Memorandum on January 29, 1981. 46 F.R. 11227 (Jan. 29, 1981). President Reagan's Memorandum postponed the effective date of all previously promulgated regulations for only sixty (60) days, and exempted all regulations related to the foreign affairs power of the United States from the Memorandum's directives.

7. While the Courts of Appeals have "sole and exclusive" jurisdiction over all final orders of deportation, 8 U.S.C. § 1105a(a) (1993), district courts have jurisdiction over habeas corpus petitions filed by aliens in custody who, after exhausting their administrative remedies, seek review of an exclusion order. *See Castillo–Magallon v. I.N.S.*, 729 F.2d 1227, 1229 (9th Cir.1984).

injunctive relief in this Court. Prior to oral argument, the parties stipulated that the execution of the INS order of exclusion and deportation of petitioner would be stayed until December 16, 1993. The purpose of the stipulation, according to representations of respondents' counsel, was to give the Attorney General an opportunity to rule on two related BIA cases involving official policy towards individuals seeking asylum based on opposition to the PRC's policy of involuntary sterilization to control population growth. It was likely, according to respondents' counsel, that the Attorney General's resolution of these cases would be dispositive of the instant case. Given this representation, the Court endorsed the stipulation and postponed resolution of the petitioner's request for immediate injunctive relief.

Thereafter, at a hearing on December 3, 1993, the respondents requested an additional extension of time beyond December 16 to allow the Attorney General to address the two pending matters which, as respondents had previously represented, would likely dispose of the instant case. The request was denied, on the ground that the respondents had already had adequate time to consider the matter.[8] On December 7, 1993, the Attorney General concluded, in essence, and without explanation that no determination was required concerning the putative conflict between a 1990 executive order and *Chang*.[9] Following receipt of the Attorney General's statement the Court, pursuant to Rule

65(a)(2) Fed.R.Civ.P., ordered that the merits of the case should be accelerated and consolidated with the consideration of the preliminary injunction, and that the matter would be decided on December 16, 1993, the date on which the stay of the order of deportation and exclusion expires. Subsequently, the Court continued the effectiveness of the stay, pending issuance of this opinion.

## III.

Analysis of the questions presented here properly begins with an elucidation of the well-established principle that an agency's consistent interpretation of its statute or regulations is entitled to judicial deference. *See Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566–67, 100 S.Ct. 790, 797–98, 63 L.Ed.2d 22 (1980). This principle, put another way, holds that "[a] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. The rationale behind the *Chevron* principle is the notion that, within limits, Congress is entitled to delegate certain policy choices to agencies or Executive departments presumed to possess the pertinent expertise. Thus, the *Chevron* principle of judicial deference is "but a short-hand way of saying that the judiciary is duty bound to respect the origi-

---

**8.** The Attorney General had already had several months to resolve the matter that the government represented was likely to be dispositive of the issues at bar. *See* Att. Gen. Order No. 1756–93 (June 29, 1993).

**9.** The Attorney General's statement, in full, provides:

**IN EXCLUSION PROCEEDINGS**

Pursuant to 8 C.F.R. 3.1(h)(1)(ii), the Board of Immigration Appeals ("BIA") referred, for my review, its decisions in these two cases in which nationals of the People's Republic of China claimed eligibility for asylum and withholding of deportation under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101(a)(42)(A), 1253(h). In both cases, the BIA found that the applicants' evidence was not credible, and that the applicants' accounts, if true, were inadequate to establish eligibility for asylum and withholding of deportation under the interpretation of the INA that the BIA

adopted in *Matter of Chang,* Int. Dec. 3107, 1989 WL 247513 (BIA May 12, 1989). The BIA also noted that Executive Order No. 12,-711, 55 Fed.Reg. 13, 897 (1990), which sets forth standards for eligibility for asylum and withholding of deportation for aliens fleeing coercive abortion and sterilization policies, is in conflict with *Chang. Matter of Chu,* A 71 824 281 (BIA June 7, 1993) at 6–14: *Matter of Tsun,* A 71 824 320 (BIA June 7, 1993) at 7–11. In referring these cases for my review, the BIA requested that I resolve the conflict. I granted the BIA's request for review. Attorney General Order No. 1756–93 (June 29, 1993). After review, it is apparent that the BIA's determination in these cases do [sic] not require a determination that one or the other of these standards is lawful and binding. Because such a determination is not required, the Order granting review is rescinded.

nal choice of the political branches in vesting authority in an agency to interpret and enforce a statute." *Continental Air Lines Inc., v. Dep't of Transp.,* 843 F.2d 1444, 1454 (D.C.Cir.1988). In this context, judicial deference to an agency's interpretation of its own statutes and regulations can be viewed as one aspect of the intricate choreography that maintains the appropriate balance of power among the three co-equal branches of government. This choreography insures that, in the dance of governance, no branch leads too much or steps on the toes of the other branches.

■ But significantly, there are important limits to the notion of judicial deference. First, deference is appropriate only when an agency or department interprets its own rules and regulations. *See, e.g., Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. Only in this event is there any validity to the assumption that underlies judicial deference, namely a congressional intent to delegate certain policy choices to expert independent agencies or to the Executive Branch. Equally evident is that deference is inappropriate where the department's or agency's interpretation is contrary to the plain language of the relevant statute or regulation. *See, e.g., Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Auth.,* 464 U.S. 89, 98 n. 8, 104 S.Ct. 439, 445 n. 8, 78 L.Ed.2d 195 (1983); *Int'l. Bhd. of Teamsters etc., v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979) ("[D]eference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose and history."). And, central to this dispute, deference is appropriate only where an agency's interpretation of its own statutes and regulations has been consistent. *See, e.g., Allen v. Bergland,* 661 F.2d 1001, 1004 (4th Cir.1981), citing *Ehlert v. United States,* 402 U.S. 99, 105, 91 S.Ct. 1319, 1323, 28 L.Ed.2d 625 (1971) (courts obligated to regard as controlling a reasonable, consistently applied agency interpretation of its own regulations). As the Supreme Court has noted, "an agency interpretation of a relevant provision which conflicts with the agency's earlier interpretations is entitled to considerably less deference than a consistently held agency view." *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987).[10] Faced with conflicting administrative interpretations, courts should not engage in "blind adherence" to an agency's position. *United Transp. Union v. Dole,* 797 F.2d 823, 829 (10th Cir.1986). To hold otherwise and defer to inconsistent agency interpretations would create a scheme of statutory construction based not on a government of laws, but rather on a government of "who was most recently elected."

## IV.

■ The record discloses no fewer than nine inconsistent administrative pronouncements regarding the ability of aliens to seek asylum, pursuant to 8 U.S.C. § 1101(a)(42)(A), based on opposition to a foreign government's coercive population control policies. The following table identifies these pronouncements and displays their lack of consistency:

| Pronouncement | Asylum Eligibility |
| --- | --- |
| 1. August 5, 1988 Guidelines promulgated by then Attorney General Edwin Meese | asylum permitted |
| 2. <u>Matter of Chang</u>, Int.Dec. 3107 (BIA May, 1989) | asylum not permitted |
| 3. January, 1990 Interim Rule promulgated by then Attorney General Richard Thornburg | asylum permitted |

---

**10.** *See also General Elec. Co. v. Gilbert,* 429 U.S. 125, 143, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976) ("[w]e have declined to follow administrative guidelines in the past where they conflicted with earlier pronouncements of the agency"); *accord Wilcox v. Ives,* 864 F.2d 915, 924–25 (1st Cir.1988) (The "general admonitions for judicial review of agency action are even more exacting when the courts are faced with inconsistent agency positions.").

| Pronouncement | Asylum Eligibility |
|---|---|
| 4. Executive Order No. 12,711, 55 Fed.Reg. 13, 897 (1990), issued by President George Bush | asylum permitted |
| 5. July, 1990 Rule | asylum not addressed |
| 6. November, 1991 Memorandum from the General Counsel of the I.N.S. | determining that PRC's coercive family planning practices constitute persecution on account of political opinion |
| 7. January 1993 Rule promulgated by then Attorney General William Barr | asylum permitted |
| 8. Matter of Chu, A 71 824 281 (BIA June 7, 1993), Matter of Tsun, A 71 824 320 (BIA June 7, 1993), and Matter of G—, A 72 761 974 (BIA Dec. 8, 1993) | asylum not permitted |
| 9. December 7, 1993 pronouncement by Attorney General Janet Reno | declined to address conflicting views in Chang and Executive Order 12,711 |

---

Some of these pronouncements might, standing alone or in the absence of any inconsistency, merit judicial deference under *Chevron*. But taken together, they amount to an administrative cacophony undeserving of judicial deference. To hold otherwise would be judicial abdication, not principled judicial deference.

A brief review of some of these pronouncements confirms this conclusion. To begin with, the government contends that the BIA, the highest administrative tribunal empowered to conduct deportation proceedings, has acted consistently and designated *Matter of Chang* as precedent applicable to all cases involving asylum claims based on opposition to a country's coercive family planning policies.[11] This contention might succeed if the BIA's pronouncements stood alone. They do not. As the table reflects, the BIA's ruling in *Chang* is only one of many Department of Justice pronouncements regarding the ability of individuals to seek asylum based on a well-founded fear of persecution for expressing opposition to coercive population control measures. The most recent of these pronouncements is the January 1993 Rule, signed by then Attorney General William Barr, the Preamble of which specifically states that "one effect of this rule is to supersede the decision in *Matter of Chang* ... to the extent that it held that the threat of forced sterilization pursuant to a government family planning policy does not give rise to a well-founded fear of persecution on account of political opinion...." That this is a pronouncement of the Attorney General is especially significant, for the Attorney General has the authority to overrule BIA decisions. *See* 8 C.F.R. § 3.1(g) (1993). Thus it is clear, and the government so concedes, that the 1993 Rule was designed to overrule *Chang*.

 Even so, there are questions whether the 1993 Rule ever became effective. In a raw political move, the 1993 Rule was withdrawn from the Federal Register barely three days before its scheduled publication,

---

11. *See* 8 C.F.R. § 3.1(g) (1993) (decisions designated by the BIA may serve as precedent in all proceedings involving the same issue or issues); *see, e.g., Matter of Chu,* A 71 824 281 (BIA June 7, 1993); *Matter of Tsun,* A 71 824 320 (BIA June 17, 1993); *Matter of G—,* A 72 761 974 (BIA Dec. 8, 1993) (applying *Chang* in denying PRC residents asylum based on opposition to coercive family planning practices).

thereby raising the question whether the regulation has any legal force. Respondents contend that the 1993 Rule, as a non-published substantive rule, has no legal force.[12] Federal Register publication is required for substantive rules of general applicability, as well as for statements of general policy or interpretations of general applicability formulated and adopted by an agency.[13] Yet, failure to publish a rule is not necessarily fatal.[14] Rather, under *Nguyen v. United States*, 824 F.2d 697 (9th Cir.1987), courts should consider a variety of factors in determining whether a non-published agency interpretation should nonetheless be given legal effect, including (i) whether the unpublished interpretation affects individuals' substantive rights, (ii) whether the interpretation deviates from the plain meaning of the statute or regulation at issue, and (iii) whether the interpretation limits administrative discretion. *Nguyen*, 824 F.2d at 701. Under these factors, the unpublished 1993 Rule is arguably entitled to legal effect.[15] Yet, the status and legal effect of the 1993 Rule remain unclear.[16]

**12.** Respondents do not contest petitioner's classification of the 1993 Rule as substantive. Yet, the 1993 Rule could arguably be classified as an interpretative rule setting forth a general statement of policy. Lack of publication is irrelevant if the 1993 Rule is deemed interpretative, as the APA does not require the publication of interpretative rules. 5 U.S.C. § 553(d)(2); *see Allen v. Bergland*, 661 F.2d 1001, 1006 (4th Cir.1981).

**13.** 5 U.S.C. § 552(a)(1)(D) (Supp.1992); *see Knutzen v. Eben Ezer Lutheran Housing Ctr.*, 815 F.2d 1343, 1351 (10th Cir.1987) (APA requires publication of rules and public statements if such rules or public statements constitute change from existing law, policy, or practice); *Bergland*, 661 F.2d at 1006.

**14.** *See Caribbean Produce Exchange v. Sec. of Health and Human Services*, 893 F.2d 3, 7 (1st Cir.1989) citing *Welch v. United States*, 750 F.2d 1101, 1111 (1st Cir.1985) ("failure to publish in the Federal Register does not automatically invalidate an administrative regulation or guideline"); *but cf. Jerri's Ceramic Arts v. Consumer Product Safety Comm'n*, 874 F.2d 205, 208 (4th Cir.1989) (indicating that a substantive rule not published, as required under the Federal Hazardous Substances Act, must be set aside).

**15.** It is difficult to see how the 1993 Rule could have more of an impact on petitioner's substantive rights: under the 1993 Rule petitioner has grounds for seeking asylum, while under *Chang* he does not. *See Nguyen*, 824 F.2d at 701 (an unpublished rule affects substantive rights when it changes existing rules, policy, or practice); *see, e.g., Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983). And the 1993 Rule deviates from other agency interpretations of 8 U.S.C. § 1101(a)(42)(A) addressing individuals' ability to seek asylum based on opposition to a government's coercive population control policies. Finally, the 1993 Rule restricts the discretion of immigration officers in classifying an individual as a refugee, thus altering the primary prerequisite for seeking asylum. *See, e.g., Nguyen*, 824 F.2d at 701.

**16.** A regulation must be substantive or legislative in order to have the force and effect of law. *See United States v. Harvey*, 659 F.2d 62, 64 (5th Cir.1981); *Guardian Fed. Sav. & Loan Ass'n v. Federal Sav. & Loan Ins. Corp.*, 589 F.2d 658, 664 (D.C.Cir.1978). And it is not entirely clear whether the 1993 Rule is substantive or interpretative. A rule that creates new rights and duties is typically regarded as legislative or substantive. *See Amer. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1110 (D.C.Cir. 1993); *Jerri's Ceramic Arts*, 874 F.2d at 207; *but compare Caribbean Produce Exchange*, 893 F.2d at 8 (mere fact that a rule has "substantial impact does not make a rule legislative ... but may be relevant in construing the intent of the agency in issuing the rule"). Because the 1993 Rule may be viewed as creating new rights for individuals seeking asylum based on opposition to coercive population control policies, the rule is arguably substantive or legislative.

An interpretative rule, by contrast, does not create new rights or a binding legal norm, but merely sets forth "what the agency seeks to establish as policy." *See American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C.Cir.1987), citing *Pacific Gas & Elec. Co., v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C.Cir.1974); *see also Amer. Mining Congress*, 995 F.2d at 1110. And respondents here plausibly argue that the 1993 Rule is merely interpretative, not substantive, as it merely clarifies earlier regulations defining what constitutes a "well-founded fear of persecution on the basis of political opinion."

Procedurally, the Attorney General provided public notice of the 1993 Rule and allowed the submission of comments. And perhaps most persuasively, the 1993 Rule was submitted for Federal Register publication. Thus, at first glance it appears clear that the Attorney General intended for the 1993 Rule to have binding legal force. Yet, the 1993 Rule states that the Rule's extensive review process "should eliminate any doubt about the validity of *prospective applications* of its provisions." (emphasis added). As the D.C. Circuit recently noted, "statements issued by an agency to advise the public *prospectively* of the manner in which the agency proposes to exercise a discretionary power" are general statements of policy, not substantive rules.

By contrast, there is no doubt that the January 1990 Interim Rule, which also contradicted *Chang*, was validly published and in effect from January through June 1990. This Interim Rule reinterpreted 8 C.F.R. §§ 208.5 and 242.17(c) and "clarif[ied] the burden of proof for applicants for refugee status, withholding of deportation and asylum by establishing that an alien fleeing coerced population control policies of forced abortions and sterilization may be considered to have a clear probability ... or well-founded fear ... of persecution on account of political opinion." 55 Fed.Reg. 2803 (Jan. 29, 1990). Though it contradicted *Chang*, the January 1990 Interim Rule likely did not erase or overrule Chang, for it was apparently an interpretative rule [17] of limited legal force.[18] Even so, this validly published and promulgated Rule reflects the considered decision of the Attorney General to construe § 1101(a)(42)(A) to permit granting asylum in the circumstances at bar. In any event, there is significant doubt whether the 1990 Interim Rule was either binding on BIA judges, or affected the legal force of *Chang*.

As if to underscore the correctness of the Attorney General's construction of the Act President Bush, in April 1990, issued Executive Order 12,711, which directed the Attorney General and Secretary of State to give "enhanced consideration" to asylum claims based on an applicant's fear of persecution, upon return to his or her country, related to the applicant's opposition to that country's policy of forced abortion or coerced sterilization.[19] Despite all this, it appears that the January 1990 Interim Rule did not survive beyond July 1990, when the Attorney General issued a comprehensive revision of the asylum regulations that inexplicably omitted any reference to the January 1990 Interim Rule. *See* 55 Fed.Reg. 30674 (July 17, 1990). Indeed, the January 1990 Interim Rule quite simply vanished from the regulations for reasons that remain obscure.[20] Yet, it is worth considering whether, say in March 1990, courts would have given deference to the validly promulgated January 1990 Interim

*Amer. Mining*, 995 F.2d at 1109, quoting *Attorney General's Manual on the Administrative Procedure Act* (1947); *see also Mada–Luna v. Fitzpatrick*, 813 F.2d 1006, 1014 (9th Cir.1987) (rule which operates prospectively and leaves decision maker free to consider facts in individual cases is interpretative).

Finally, it is worth noting that a number of courts have expressed frustration in distinguishing between substantive and interpretative rules. *See Jerri's Ceramic Arts*, 874 F.2d at 207 (distinction between interpretative and substantive rules "not easily made"); *Community Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C.Cir.1987) (distinction between legislative and interpretative rules is "tenuous," "blurred," "baffling," and "enshrouded in considerable smog"); *see, e.g., Knutzen*, 815 F.2d at 1351 n. 6 (indicating that courts have applied at least three different tests in distinguishing between legislative and interpretative rules). In the final analysis, these puzzling issues as they relate to the nature and continuing validity of the 1993 Rule need not be resolved in order to decide the case at bar.

**17.** The January 1990 Interim Rule, by its own terms, encompassed "interpretative rules and general statements of policy."

**18.** *See Chrysler Corp. v. Brown*, 441 U.S. 281, 301, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979); *Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974) (to have force of law a regulation "must be a substantive or legislative-type rule ... which has been issued by the agency pursuant to statutory authority and promulgated in accordance with the procedural requirements of the Administrative Procedure Act"); *see also Jerri's Ceramic Arts*, 874 F.2d at 207 (a "substantive or legislative rule ... has the force of law").

**19.** Executive Order 12,711 specifically referred to the January 1990 Rule as implementing the Administration's policy of enhanced consideration for asylum claims based on the applicant's opposition to a country's coercive population control policies.

**20.** Circumstantial evidence indicates that the omission of the January 1990 Interim Rule was mere inadvertence. An October 1990 article entitled "INS Asylum Regulations Mistakenly Supersede Regulations on PRC 'One Couple, One Child' Policy" notes that the July 1990 Rule "is an example of the bureaucratic left hand not noticing what the bureaucratic right hand is doing." 67 Interpreter Releases 1222 (Oct. 29, 1990). The article further quotes an INS spokesperson as indicating that new regulations would be issued to correct the omission. *Id.*

In addition, the text of the 1993 Rule indicates that the Attorney General viewed the July 1990 Rule as amending asylum procedures while not affecting the substantive right, set forth in the January 1990 Interim Rule, of individuals to seek asylum based on a well-founded fear of persecution for opposing coercive population control measures.

Rule in preference to *Chang.* This hypothetical vividly illustrates the cacophony of administrative voices on this issue.

Finally, it is worth noting that four Attorney Generals in three administrations have made pronouncements regarding the ability of individuals to seek asylum upon expressing a "well-founded fear of persecution" based on their opposition to coercive population control policies. On August 5, 1988 then Attorney General Edwin Meese promulgated a series of policy guidelines classifying opposition to coercive population control measures as a form of "political opinion" sufficient to support a claim for asylum. The BIA refused to follow these guidelines, noting (curiously) that "these guidelines ... were directed to the Immigration and Naturalization Service, rather than the immigration judges and this Board." *Matter of Chang,* Int. Dec. 3107, 1989 WL 247513, 1989 LEXIS 13, *10.[21] Attorney General Richard Thornburg then promulgated the January 1990 Interim Rule which implicitly overruled *Chang,* while Attorney General William Barr promulgated

the 1993 Rule that was explicitly intended to overrule *Chang.* In a December 7, 1993 ruling, current Attorney General Janet Reno declined to review two BIA decisions, each citing *Chang* as precedent, that held that citizens of the PRC were not entitled to asylum based on a well-founded fear of persecution based on opposition to the PRC's coercive population control policies.[22] In so doing, Attorney General Reno failed to address the merits of either *Chang,* or of the other conflicting Department of Justice interpretations of § 1101(a)(42)(A).[23]

In sum, on the question of statutory interpretation at bar, there is a cacophony of administrative voices, each singing a different tune in a different key. Deference to one voice or one tune in these circumstances is unwarranted.[24] Given this [25] and given the responsibilities of courts under the APA [26] to set aside agency actions contrary to law, this Court must now consider, independently of past administrative interpretations of § 1101(a)(42)(A), whether that statute sanctions asylum in the circumstances at bar.

21. Thus, there is some indication that the BIA and INS, though both departments within the Justice Department, applied different standards in determining whether individuals could seek asylum based on opposition to coercive population control practices in the PRC.

22. Notably, these cases involved situations where the BIA determined that the applicant's evidence was not credible. The Attorney General did not address situations, such as the case at bar, where an applicant's testimony was deemed credible.

23. The BIA requested that the Attorney General review these cases in order to resolve the conflict between the holding in *Chang,* and the position outlined in Executive Order 12,711. The Attorney General declined to review the cases and noted that "it is apparent that the BIA's determination in these cases do[es] not require a determination that one or the other of these standards is lawful and binding."

24. In this respect, this case is similar to *Wilcox v. Ives,* 864 F.2d 915 (1st Cir.1988), where the First Circuit declined to defer to conflicting agency interpretations of a regulation. In *Wilcox,* the Secretary of Health and Human Services published an initial regulation regarding monthly child support payments to AFDC families. *Wilcox,* 864 F.2d at 922. Nine days later, the Secretary proposed a second version of the same rule.

*Id.* The Secretary reiterated the position outlined in the second rule in a Federal Register statement, but ultimately withdrew the proposed amendment. *Id.* at 922–23. The Secretary then "flip flop[ped]" and revised the rule yet again. *Id.* at 923. After noting that "[w]hat is revealed by the history of the Secretary's regulations ... since the amended statute was passed in 1984 is a series of self-contradictory rules," the First Circuit determined that such constantly shifting agency interpretations were entitled to little, if any, deference. *Id.* at 923–25.

25. Worth noting also is that, in any event, "the agency's preferred interpretation is only one input in the interpretational equation." *United Transport. Union v. Dole,* 797 F.2d 823, 829 (10th Cir.1986), quoting *Zuber v. Allen,* 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969).

26. Specifically, the APA provides:

[t]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of their terms of an agency action. The reviewing court shall ...
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
(B) contrary to constitutional right, power, privilege, or immunity.

## V.

To be eligible for asylum under the Act, an alien must be statutorily classified as a "refugee" under 8 U.S.C. § 1158(a). *Huaman–Cornelio v. Bd. of Immigration Appeals*, 979 F.2d 995, 999 (4th Cir.1992). A refugee is any person who is unable or unwilling to return to his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." 8 U.S.C. § 1101(a)(42)(A) (1993); *see M.A. A26851062 v. I.N.S.*, 899 F.2d 304, 307 (4th Cir.1990) (en banc). The standard used to determine whether an individual has "well-founded fear of persecution" is a "reasonable person test." *Huaman–Cornelio*, 979 F.2d at 999, citing *M.A.*, 899 F.2d at 311. An individual seeking asylum under the "reasonable person" standard must show (i) that a reasonable person in the circumstances would fear persecution if he or she were returned to his or her native country and (ii) that the fear has "some basis in the reality of the circumstances" and is validated with "specific, concrete facts." *Huaman–Cornelio*, 979 F.2d at 999, citing *M.A.*, 899 F.2d at 311 (citations omitted).

A generalized fear of persecution is not sufficient to establish eligibility for asylum. As the Fourth Circuit has noted, "[e]ven aliens with a well-founded fear of persecution supported by concrete facts are not eligible for asylum if those facts indicate only that the alien fears retribution over purely personal matters or general conditions of upheaval and unrest." *Huaman–Cornelio*, 979 F.2d at 1000 (contention that group in Peru might conceivably harm petitioner after labeling him a traitor is not sufficient to establish eligibility for asylum absent concrete evidence that group had so labeled petitioner.).[27] Accordingly, petitioner cannot make out a valid claim for asylum by contending that the current PRC government is generally repressive, or by merely contending that he disagrees with a particular government policy. Rather, petitioner must show that he fears persecution stemming from one of the five categories of persecution enumerated in the Act.[28] Petitioner must further show that he fears particularized persecution directed at him personally on the basis of his race, religion, nationality, membership in a particular social group, or political opinion. *See Huaman–Cornelio*, 979 F.2d at 999–1000.

Neither the INA nor the Refugee Act specifically address whether asylum eligibility can be based upon an individual's fear of persecution stemming from that individual's opposition to a government's coercive population control practices.[29] Thus, the inquiry in the case at bar must proceed in two stages. First, the Court must determine whether petitioner's opposition to coercive

---

5 U.S.C. § 706 (1993).

27. *See also I.N.S. v. Elias–Zacarias*, —— U.S. ——, —— ——, 112 S.Ct. 812, 814–16, 117 L.Ed.2d 38 (1992) (political nature of petitioner's attempted recruitment by Guatemalan guerrillas did not make such recruitment "persecution on account of political opinion"); *M.A.*, 899 F.2d at 314–315 (fear of reprisal for refusal to join either Salvadoran military or anti-government guerilla groups, in light of generally violent conditions in El Salvador, does not constitute a "well-founded fear of persecution").

28. *See Matter of T—*, Int. Dec. 3187 (BIA 1992) (asylum not available for human rights abuses not directly related to the five grounds for asylum enumerated in the INA).

29. Respondents argue that asylum cannot be based on opposition to the PRC's population control policies as these policies, because they apply equally to all citizens, are not per se "persecutive." *See Matter of G—*, A72 761 974, at 17 (Dec. 8, 1993) ("[T]o prevail on a claim premised on China's one couple, one child policy, it is incumbent upon the applicant to come forward with facts that establish that the policy was being selectively against him as a member of a particular religious or other social group, or being used as a means to punish him because of his race, nationality, or political opinion."). This argument is fallacious. Nothing in the Act precludes asylum for aliens persecuted by a government because of political opposition to uniformly applied governmental policies. Put another way, nothing in the statute requires that an asylum applicant's political opinion, for which she or he is persecuted, must relate to a governmental policy that is not uniformly applied. Indeed, the uniformly applied policy of most totalitarian governments (e.g., Cuba and the former Soviet Union and its satellites) is to persecute all who disagree with the government's legitimacy, or who seek to replace the government by democratic means. Yet, citizens in this category have always been beneficiaries of asylum under § 1101(a)(42)(A).

population control practices in the PRC constitutes a "political opinion" within the meaning of 8 U.S.C. § 1101(a)(42)(A). Next, the Court must decide whether petitioner has a particularized, well-founded fear of persecution based on this purported political opinion.

 The heart of petitioner's asylum claim is the contention that his opposition to the PRC's coercive population control policies constitutes a "political opinion" within the meaning of the Act. No definition of the phrase "on account of political opinion" appears in the Act or its legislative history. *See Perlera–Escobar v. Executive Office for Imm.*, 894 F.2d 1292, 1296 (11th Cir.1990); *Campos–Guardado v. I.N.S.*, 809 F.2d 285, 290 (5th Cir.), *cert. denied* 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987). Yet, there can be little doubt that the phrase "political opinion" encompasses an individual's views regarding procreation. To begin with, "political" is commonly defined as "of or pertaining to exercise of rights or privileges...." BLACK'S LAW DICTIONARY 1158 (6th ed. 1991). And it is settled that the right to bear children is "one of the basic civil rights of man." *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). Specifically, the fundamental right to procreate is protected by "penumbras" emanating from the Bill of Rights. *See Griswold v. Connecticut*, 381 U.S. 479, 484–86, 85 S.Ct. 1678, 1681–83, 14 L.Ed.2d 510 (1965); *Roe v. Wade*, 410 U.S. 113, 154–56, 93 S.Ct. 705, 727–29, 35 L.Ed.2d 147 (1973). Indeed, "[t]he decision of whether or not to beget or bear a child is at the heart of [a] cluster of constitutionally protected rights." *Carey v. Population Serv. Int'l.*, 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977). While the right to procreate is not absolute, intrusions upon this fundamental right are looked upon with disfavor. *See, e.g., Carey*, 431 U.S. at 687, 97 S.Ct. at 2017 ("[t]he teaching of *Griswold* is that the Constitution

protects individual decisions in matters of childbearing from unjustified intrusion by the State."). Involuntary sterilization, in particular, has been viewed as an egregious infringement on the fundamental right to procreate. *See Skinner*, 316 U.S. at 541, 62 S.Ct. at 1113 (invalidating state statute allowing for involuntary sterilization of habitual offenders). As Justice Douglas noted in *Skinner*:

> [t]he power to sterilize, if exercised, may have subtle, far-reaching and devastating effects. In evil or reckless hands, it can cause races or types which are inimical to the dominant group to wither and disappear. There is no redemption for the individual whom the law touches. Any experiment which the State conducts is to his irreparable injury. He is forever deprived of a basic liberty.

*Skinner*, 316 U.S. at 541, 62 S.Ct. at 1113.

 Because the right to make procreational decisions is a basic liberty right protected under the Bill of Rights, it is, in that respect, analogous to other fundamental rights that are well-recognized as legitimate grounds for asylum, such as the freedom of religion[30] and freedom of speech[31]. Further, it is beyond dispute that the expression of one's views regarding issues related to the right to procreate is "political." *See, e.g., Planned Parenthood of Southeastern Pa. v. Casey*, —— U.S. ——, ——, 112 S.Ct. 2791, 2815, 120 L.Ed.2d 674 (1992) (noting that part of the Court's hesitation to overrule *Roe v. Wade* stemmed from belief that "whatever the premises of opposition may be, only the most convincing justification under accepted standards of precedent could suffice to demonstrate that a later decision overruling the first was anything but a surrender to political pressure ...").[32] In addition, opposition to certain aspects of procreative rights and privileges may involve the exercise of protected political rights and privileges.[33] As

---

**30.** *See Matter of Soleimani*, Int. Dec. 3118 (BIA 1989) (Jewish citizen of Iran could establish valid asylum claim based on persecution suffered in Iran on account of religion.).

**31.** The Third Circuit has recently indicated that, under certain circumstances, publicly expressed feminism may qualify as a political opinion with-

in the meaning of the relevant statutes. *Fatin v. I.N.S.*, 12 F.2d 1233 (3rd Cir.1993).

**32.** *See also Roe v. Wade*, 410 U.S. at 159–62, 85 S.Ct. at 730–32.

**33.** *See, e.g., Bray v. Alexandria Women's Health Clinic*, —— U.S. ——, 113 S.Ct. 753, 122 L.Ed.2d

the right to procreate, and therefore petitioner's expression of this right, is a fundamental right analogous to other fundamental rights that may support an asylum claim based on "persecution on the basis of political opinion," petitioner's opposition to the PRC's population control policies constitutes a "political opinion" within the meaning of § 1101(a)(42)(A).

■ This is not to say that a citizen of the PRC, or indeed of any country, may establish asylum eligibility merely by pointing to some right guaranteed in the United States Constitution that is not guaranteed in his or her respective country. And courts interpreting § 1101(a)(42)(A) should not "make immigration decisions based on [their] own implicit approval or disapproval of U.S. foreign policy and the actions of other nations." *M.A. v. I.N.S.*, 899 F.2d 304, 313 (4th Cir.1990). Similarly, to rule here contrary to *Chang* merely due to disagreement on policy grounds with the BIA's conclusion "would transform the political asylum process from a method of individual sanctuary left largely to the political branches into a vehicle for foreign policy debates in the courts." *M.A.*, 899 F.2d at 313.[34] It would indeed be an infringement upon the territory of the political branches to deem the PRC's population control policies evil, immoral, or the like and to conclude, based on personal repugnance to the PRC's policies, that asylum is warranted for those opposed to such practices. It is not, however, an infringement upon the foreign policy territory of the political branches to conclude that an individual's views in opposition to a government's official policy on population control and family planning, especially when such policies involve coerced sterilization and abortion, are "political" within the meaning of 8 U.S.C. § 1101(a)(42)(A).

■ But the inquiry cannot end here, for it is not enough that petitioner holds a "political opinion" within the meaning of 8 U.S.C. § 1101(a)(42)(A). Rather, in order to establish eligibility for asylum based on a well-founded fear of persecution, petitioner must have expressed an "overt manifestation of a political opinion." *De Valle v. I.N.S.*, 901 F.2d 787, 797 (9th Cir.1990), citing *Bolanos–Hernandez v. I.N.S.*, 767 F.2d 1277, 1287 (9th Cir.1984). Yet, an "overt manifestation" of a political opinion does not require that an individual have participated in demonstrations or political marches, have made political speeches, or the like. Rather, petitioner may show persecution on the basis of political opinion by showing that:

(i) there is a significant relationship between the victim (namely petitioner) and the persecutor; and, (ii) that petitioner has engaged in sufficiently conscious and deliberate decisions or acts which attribute certain political opinions to plaintiff.

*De Valle*, 901 F.2d at 791, citing *Desir v. Ilchert*, 840 F.2d 723, 728 (9th Cir.1988).

There can be no question that petitioner has made an "overt manifestation" of his opposition to the PRC's "one couple one child" policy, and that petitioner has been persecuted for expressing this opposition. Petitioner and his wife openly expressed their opposition to the PRC's population control policies by refusing to comply with sterilization orders and by fleeing from their home village after receiving government sterilization notices. And the government, after learning that petitioner and his wife had fled, confiscated the personal property of petitioner and his wife and destroyed the couple's living quarters. It simply defies logic to contend that these governmental actions do not amount to persecution.

34 (1993) (discussing balancing of rights of abortion protesters and women seeking abortions); cf. *Casey v. Planned Parenthood of Southeastern Pa.*, —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

**34.** *See, e.g., Nwolise v. I.N.S.*, 4 F.3d 306, 309 (4th Cir.1993), petition for cert. denied —— U.S. ——, 114 S.Ct. 888, 127 L.Ed.2d 82 (1994) ("we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings") (quoting *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *West v. Bowen*, 879 F.2d 1122, 1124 (3rd Cir.1989), citing *Pennsylvania v. United States*, 752 F.2d 795, 798 (3rd Cir.1984) (A "reviewing court must uphold agency's interpretation if it is reasonable, notwithstanding the court's belief that some other policy was preferable.").

Actions the PRC government took against petitioner in the instant case stand in stark contrast to the facts in *Chang*. In *Chang*, petitioner's asylum application merely indicated that petitioner was an anti-Communist who fled the PRC "because of Communist domination...." *Matter of Chang*, Int. Dec. 3107, 1989 WL 247513, 1989 BIA LEXIS 13, *3. The petitioner in *Chang* further indicated that neither he nor his family had been mistreated, and that the family had not suffered from government policy any more than the rest of the citizens of the PRC. *Id.* Thus, petitioner in *Chang* arguably failed to establish a threshold well-founded fear of particularized persecution.[35] Based on these facts, the BIA in *Chang* stated that the mere implementation of the "one couple one child" policy was not "on its face persecutive." *Chang*, 1989 WL 247513, 1989 BIA LEXIS at *12.

Petitioner in the instant case is not challenging the mere implementation of the PRC's "one couple one child policy." Rather, he is contending that his opposition to the policy, even if the policy is not viewed as inherently "persecutive" per *Chang*, led to a situation where the government directly persecuted him and his family as a result of his opposition to the policy. Petitioner's testimony, deemed credible by the immigration judge, makes clear that petitioner has met the threshold requirement of showing that he faces a "well-founded fear of persecution" for expressing his "political opinion" regarding the PRC's coercive population control measures.[36]

 Again, it is worth emphasizing that this decision does not derive from any of the Court's personal views. Rather, the Court

merely determines that an individual's expression of his or her views in opposition to a country's coercive population control measures may constitute a "political opinion" within the meaning of 8 U.S.C. § 1101(a)(42)(A). And, under the specific facts of this case, petitioner has shown that he faces particularized persecution because of his opposition to the PRC's population control practices, and thus has established prima facie eligibility for asylum. In essence, then, petitioner is one of the "huddled masses ... yearning to be free"[37] who has established statutory eligibility for asylum, and it is now within the discretion of the Attorney General either to grant or deny petitioner's specific asylum request. 8 U.S.C. § 1158(a); *see M.A.*, 899 F.2d at 307.

**35.** Further, the petitioner in *Chang* did not mention any opposition to the PRC's population control policies until his deportation hearing, where petitioner indicated that he and his wife fled their home village because they had two children and "did not agree to stop having more children." *Matter of Chang*, Int. Dec. 3107, 1989 WL 247513, 1989 BIA LEXIS 13, *3–4. It was not until petitioner's appeal before the BIA that petitioner, through counsel, indicated that he and his wife were ordered to submit to mandatory sterilization, and that he fled the PRC to avoid the operation. *Chang*, 1989 WL 247513, 1989 BIA LEXIS at *4–5.

**36.** Because petitioner can make out an asylum claim based on a "well founded fear of persecution on the basis of * * * political opinion" per 8 U.S.C. § 1101(a)(42)(A), the Court need not reach the question of whether petitioner qualifies for withholding of deportation pursuant to 8 U.S.C. § 1253(h). *See, e.g., Quintanilla–Ticas v. I.N.S.*, 783 F.2d 955, 956–57 (9th Cir.1986) (indicating that the BIA need not assess the same evidence under both standards).

**37.** E. Lazarus, *New Colossus*.