**WING DING CHAN, Petitioner,**

v.

**IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.**

No. 79–1254.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 16, 1980.

Decided Aug. 4, 1980.

Mark A. Mancini, Washington, D. C., with whom Jack Wasserman, Washington, D. C., was on the brief, for petitioner.

Eric A. Fisher, Atty., Dept. of Justice, Washington, D. C., with whom Lauren S. Kahn, Atty., Dept. of Justice, Washington, D. C., was on the brief, for respondent.

Before ROBINSON and MIKVA, Circuit Judges, and JUNE L. GREEN *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge MIKVA.

- MIKVA, Circuit Judge:

Petitioner Wing Ding Chan (Chan) seeks review of an order of the Board of Immigration Appeals denying Chan's application for adjustment of status to that of a permanent resident under Section 245 of the Immigration and Nationality Act, 8 U.S.C. § 1255 (1976),[1] and directing his deportation from the United States for overstaying his nonimmigrant visa.[2] Conceding that he is deportable, Chan claims that the Board erred in making certain factual determinations and improperly exercised its discretion in rejecting his application for adjustment of status. Therefore, the sole issue before the court is whether the Board lawfully denied the adjustment application. We uphold the Board in its findings and in its exercise of discretion, and affirm the Board's decision.

## I. BACKGROUND

Chan is a native of the People's Republic of China who has come to the United States at least twice. One of his visits was in April, 1968, as a crewman aboard a ship which docked at a California port. Chan disembarked on a temporary shore pass, but failed to return for the vessel's departure. Instead, he remained in the United States until February, 1972, supporting himself by working as a cook in Chinese restaurants. That employment was without the permission of the Immigration and Naturalization Service (INS) and, along with his continued unauthorized presence in this country, made Chan a candidate for deportation.[3] When the INS finally met up with Chan, he was granted voluntary departure for Hong Kong, see Section 244(e) of the Act, 8 U.S.C. § 1254(e) (1976), thereby avoiding the stigma of deportation.

Chan's next visit to the United States began December 31, 1972, less than a year after he had left the country. The authority for his second entry was a three–month nonimmigrant, business visitor visa which he had obtained from the American Consulate in Hong Kong. Shortly after his arrival, he secured an offer of employment from a Washington, D. C. restaurant. The restaurant submitted a request that Chan be certified by the Department of Labor as a Chinese specialty cook. This certification was issued in March, 1973. Chan then petitioned the INS for status as a permanent resident, based on his labor certification.

Two separate interviews with immigration officials ensued. The first interview was adjourned to allow Chan an opportunity to obtain counsel. Chan returned with a friend who acted as his interpreter, and the interview resumed. During the course of the interview, an INS officer questioned Chan about his earlier visit to the United States, about his use of a fictitious name at that time, and about his failure to report that visit on his application for the three–

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Section 245(a) provides:

   The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

Chan's statutory eligibility for adjustment of status is not in doubt in this case.

2. *In re Wing Ding Chan*, File A15 999 828 (BIA Feb. 13, 1979).

3. Although Chan's shore visa is not in the administrative record before the court, we note that nonimmigrants have been found deportable for overstaying a crewman's visa, *Shu Fuk Cheung v. INS*, 476 F.2d 1180 (8th Cir. 1973), or for engaging in unauthorized employment. *E. g., Londono v. INS*, 433 F.2d 635 (2d Cir. 1970).

month business visa. Chan acknowledged he had used a different name in connection with his previous stay in the United States. He also admitted that he had not noted his previous stay on his visa application, but claimed he had mentioned it orally to the consular official who had met with Chan concerning the visa. On July 23, 1975, Chan was interviewed a second time, again with an interpreter present. He acknowledged that he intended to stay in the United States permanently at the time he applied for his three–month business visa. Chan signed a statement declaring that the record of the interview was accurate and that he had answered the questions truthfully.

On April 8, 1976, Chan's application for adjustment of status was denied by the INS District Director for the District of Columbia because Chan was found to have procured his visa through misrepresentation. Chan was given until May 10, 1976, to leave the United States voluntarily. Chan did not leave and deportation proceedings began. On August 24, 1977, following a hearing and de novo consideration, an immigration judge declined to grant permanent resident status to Chan and directed that he voluntarily depart by December 8, 1977, or be deported. Chan appealed to the Board, but the Board affirmed the ruling of the immigration judge. After concluding that Chan "was correctly found deportable by evidence which is clear, convincing and unequivocal," the Board further determined, as a matter of discretion, that Chan should not be granted adjustment of status:

> We conclude that adjustment of status is not warranted. The absence of a criminal record and the fact that the respondent [Chan] may have complied with United States income tax requirements are not sufficient favorable factors to outweigh the adverse evidence; 1) that he withheld information from the American Consul at the time he applied for a visa; 2) that as a crewman he had deserted his vessel while in the United States in

1968 and remained here illegally under a different name until his departure in 1972; and 3) that he has no family ties in the United States. Therefore, we will deny the respondent's application for adjustment of status in the exercise of discretion. . . . Accordingly, the appeal will be dismissed.

Rec. 7. This appeal followed that decision.

As our recitation of the background of this case indicates, complications and time delays easily arise whenever the removal of an alien is sought. These proceedings began many years ago. Some seven years after Chan's visa expired, Chan is still residing in this country.

## II. STANDARD OF REVIEW

■ There is no dispute that Section 245 makes the decision on permanent residence a matter within the discretion of the Attorney General.[4] The statute provides that an alien's status "may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence." 8 U.S.C. § 1255(a) (1976). Under the statutory scheme, adjustment of status is considered a matter of administrative grace, not mere statutory eligibility. *Elkins v. Moreno*, 435 U.S. 647, 667, 98 S.Ct. 1338, 1350, 55 L.Ed.2d 614 (1978); *Ameeriar v. INS*, 438 F.2d 1028, 1030 (3d Cir.) (*en banc*), cert. dismissed, 404 U.S. 801, 92 S.Ct. 21, 30 L.Ed.2d 34 (1971). And since it is deemed to be "extraordinary relief," the alien bears the burden of convincing the decisionmaker to exercise its discretion favorably. *Jain v. INS*, 612 F.2d 683, 687 (2d Cir. 1979), cert. denied, —— U.S. ——, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980).

Judicial review of discretionary administrative action is limited. As this court has pointed out in an analogous context, our review of the Board's decision is basically a two–step process: first, the Board's find-

---

4. In accordance with Section 103 of the Act, 8 U.S.C. § 1103 (1976), the Attorney General has delegated responsibility for Section 245 determinations to the Board. 8 C.F.R. § 3.1(d)(1) (1980); *see Jarecha v. INS*, 417 F.2d 220, 223–24 (5th Cir. 1969).

ings of facts upon which its exercise of discretion is grounded must pass the substantial evidence test and, second, the Board's exercise of discretion is governed by the much less demanding "abuse of discretion" standard. *Hamad v. INS*, 420 F.2d 645, 646–47 (D.C. Cir. 1969) (suspension of deportation proceeding under Section 243(h) of the Act); *accord, Jarecha v. INS*, 417 F.2d 220, 224–25 (5th Cir. 1969).

## A. *Substantial Evidence*

■ Chan challenges the Board's factual findings as lacking sufficient evidentiary support. However, because we conclude that the Board's findings are supported by "reasonable, substantial, and probative evidence on the record considered as a whole," we are bound to accept them as correct. Section 106 of the Act, 8 U.S.C. § 1105a (1976); *see Soo Yuen v. INS*, 456 F.2d 1107 (9th Cir. 1972). Although the legal question here touches an alien's important interest in maintaining his residence in the United States, the court cannot turn the statutory standard of review into an obstacle course which the immigration authorities can never master.

In particular, Chan attacks the evidence underlying the Board's findings (1) that Chan withheld information when he applied for his visa and (2) that Chan had deserted his ship on his first trip to the United States. With respect to the first finding, there is sufficient evidence that Chan had, and failed to disclose, a preconceived intent to remain in the United States permanently when he applied for his temporary visa.[5] Such intent frequently has been deemed a critical factor in determining whether to grant adjustment of status. *See Jain v. INS, supra*, 612 F.2d at 688–89; *Von Pervieux v. INS*, 572 F.2d 114, 118 (3d Cir. 1978), and cases cited therein. Less than a year after Chan departed the United States, having remained here for almost four years without authorization, he applied for a tem-

porary visa to return to the United States. The purpose of the trip was supposedly to drum up business for the trading company where he was employed. Yet both the District Director and the immigration judge found that Chan terminated his job before leaving Hong Kong. The basis for this finding is clearly established in Chan's responses to questions put to him at the second interview by an INS official:

Q. Why did you quit your employment at the Trading Co.?

A. I wanted to come to the U.S.

Q. Why did you want to come to the U.S.?

A. I wanted to come to the U.S. to get some ideas.

Q. What ideas?

A. I just wanted to see some things, the restaurant business.

Q. What did you want to see about the restaurant business?

A. I was cook, I wanted to see if I could open a restaurant here.

Q. Did you want to remain here permantly [*sic*] in the U.S.?

A. Yes.

Q. Why did you quit a job where the owner helped you get a visa?

A. I appreciate my boss for getting a visa but I wanted see things and get better in Hong Kong.

Q. What do you mean by get better in Hong Kong?

A. I liked the U.S. better than Hong Kong.

Rec. 90–91. Chan's stated desire to open a restaurant business in the United States further evinces a preconceived intent to remain permanently. His securing a labor certification shortly after his arrival in the country bolsters the view that he always intended to stay here. The combination of all these factors–Chan's prolonged unau-

---

**5.** The visa application form (FS–257a) in use at the time Chan applied for his three–month visa expressly noted: "United States law prohibits the issuance of a temporary visa to anyone who plans to remain there permanently or in-

definitely. A person admitted to the United States with a temporary visa may engage only in the activities for which the visa is granted. A visitor may not work."

thorized stay in the United States previously; his quick return to the United States, ostensibly on business for a trading company, even though he quit the company before leaving Hong Kong; his express interest in opening a restaurant business in the United States; and his rapid moves to secure employment and apply for permanent residence—is persuasive evidence that Chan intended to come to this country permanently, not for a three—month business trip.[6]

Chan, denying he had any preconceived intent to stay in the United States, claims he did not quit his job, but went on vacation because business was slow. He further claims that he did not fully understand the interpreter at the second interview because he spoke a different dialect. Before the immigration judge, Chan denied having made some of the answers quoted to him from the transcript of the interview.

Admittedly there are complications in any record where the person charged with that record suffers from a language barrier. That problem is present in virtually every immigration case, but the authorities in this case demonstrated appropriate concern and sensitivity to it. The initial interview was recessed so that Chan could obtain counsel. He returned with a friend as translator. At the second interview, an attorney was present as an observer. That attorney later testified on Chan's behalf at the deportation hearing, where Chan was also represented by counsel. Chan signed a sworn statement certifying the accuracy of the transcript and the truthfulness of his answers.[7] Given these facts, Chan's current contention that he did not adequately comprehend what was being said is subject to doubt.

■ In essence, the question of whether Chan had a preconceived intent to remain in the United States permanently when he applied for his visa boils down to one of credibility. The immigration judge, who was in the best position to observe Chan's demeanor, found that Chan was less than forthright:

I am very unhappy with the testimony that you have given. I observed your demeanor, and I don't feel that you are forthright in your testimony and I want to tell you right now that you are under oath. If you lie under oath, you are liable to go to jail, or get a prison fine.

Rec. 82. The judgment of the immigration judge with respect to the credibility of a witness is entitled to the greatest of deference by a reviewing court. The chariness that the courts exercise in this regard is perhaps best epitomized by *Yaldo v. INS*, 424 F.2d 501 (6th Cir. 1970). In reviewing a rescission of permanent resident status and order of deportation, the court refused to entertain an argument by the alien that his ex—wife's testimony was not believable. The court declared:

This argument, however, goes to the weight of the evidence and the credibility of the witnesses and is not properly addressed to us. . . .

. . . [W]e are not permitted to substitute our judgment for that of the

---

**6.** In fact, this case closely resembles *Tuan v. INS*, 531 F.2d 1337 (5th Cir. 1976) (per curiam), in significant respects. In *Tuan*, the Fifth Circuit found that substantial evidence supported a finding that the nonimmigrant alien had a preconceived intent to remain in the United States. The evidence revealed that the alien entered the country on a business visitor's visa and sought a labor certification within one month of his arrival. In support of the labor certification, the alien submitted a letter of recommendation prepared by a Taiwan employer six months before the alien's arrival in the United States. Likewise, in the instant case, Chan applied for a labor certification less than two months after he arrived on a temporary business visa. Moreover, the letters of recommendation offered in support of Chan's application date back to December, 1971, fully two years before Chan entered the country on his business visa.

**7.** The statement reads:

I have read (or have had read to me) the foregoing statement, consisting of 3 pages. I state that the answers made therein by me are true and correct to the best of my knowledge and belief and that this statement is a full, true, and correct record of my interrogation on the date indicated by the above—mentioned officer of the Immigration and Naturalization Service. I have initialed each page of this statement (and the correction(s) noted on page(s) _____ ).

/S/ Wing Ding Chan

Board or the Special Inquiry Officer with respect to the credibility of this testimony or the ultimate findings of fact based thereon.

424 F.2d at 503 (citations omitted). Chan's lack of credibility was established below. Thus, we are satisfied that the entire record reflects "reasonable, substantial, and probative evidence," 8 U.S.C. § 1105a (1976), that Chan withheld a preconceived intent to remain in the United States permanently when he applied for his visa.[8]

As for the finding of desertion, Chan argues that there is no evidence to refute his testimony at the deportation hearing that he got lost and unintentionally missed his ship. This ignores several pieces of evidence, not the least of which is the fact that Chan made no effort to notify anyone that he had missed the boat, silently remaining in the United States for almost four years. In response to questions posed at the deportation hearing, Chan admitted that he did not attempt to contact either an agent of the steamship company or the INS after his ship sailed without him. Although "some Chinese" helped him get a restaurant job, Chan apparently did not seek their help in contacting his former employer or the immigration authorities. Chan avoided detection by the INS for four years. And finally, the following excerpt from the transcript of the first interview–an excerpt which Chan has not attacked as being faulty–provides additional support for the desertion finding:

Q. Do you remember what date you jumped ship?

A. April 2, 1968.

Q. Where did you jump ship April 2?

A. Sacremento. [sic]

Q. Previous to jumping ship had you been admitted to California as a crewman or were you detained on board ship?

A. I had a temporary pass to go on shore.

Q. Had you ever been to the U.S. before on a ship?

A. I had been to the U.S. but I had never jumped ship before.

Rec. 134. While we do not deem Chan's statement that he "had never jumped ship before" to be an admission of desertion, the quoted excerpt provides some evidence of desertion. Viewed in conjunction with missing his ship's sailing, failing to contact the steamship company afterwards, and surreptitiously remaining in the United States for a period of years, it is clear that the finding that Chan deserted his ship is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a (1976).

B. *Exercise of Discretion*

Given the congressional commitment of discretionary authority to the Authority General in Section 245, "the reviewing court is limited to an examination of the record to ascertain if that discretion has been abused. The Court may not substitute its judgment for that of the administrative agency." *Chen v. Foley*, 385 F.2d 929, 934 (6th Cir. 1967), *cert. denied*, 393 U.S. 838, 89 S.Ct. 115, 21 L.Ed.2d 109 (1968); *accord*, *Astudillo v. INS*, 443 F.2d 525 (D.C. Cir. 1971). However tempting it might be to stretch this reviewing authority because of the subject matter, it is for Congress to assign that responsibility, not for the courts to assert it. Judge Friendly described the standard in these words:

Without essaying comprehensive definition, we think the denial of suspension [of deportation] to an eligible alien would be an abuse of discretion if it were made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as

---

**8.** Having thus decided that there is ample evidence to support the Board's finding that Chan withheld information from the American consul at the time he applied for his business visa, we will not dwell on whether the record supports another INS claim that Chan also withheld a second piece of information–namely, that Chan failed to state in his visa application that he had been in the United States before on a seaman's visa. We do note that a consular memorandum provides some support for the INS claim, but our decision need not and does not rely on it.

an invidious discrimination against a particular race or group, or, in Judge Learned Hand's words, on other "considerations that Congress could not have intended to make relevant."

*Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir. 1966) (citation omitted).

■ We find the Board's exercise of discretion was carried out in a manner which was not abusive. As quoted in part I, *supra*, the Board weighed the favorable and adverse factors and concluded that the balance tipped against granting adjustment of status. We perceive no ground for invalidating the Board's determination.

Clearly, Chan's concealed intent to remain in the United States permanently at the time he sought his visa may be deemed an adverse factor. In addition, this court has held that the Attorney General, in the exercise of his discretion, can properly consider an alien's lack of family ties in the United States. *See Melachrinos v. Brownell*, 230 F.2d 42 (D.C. Cir. 1956) (suspension of deportation proceeding); *accord, Soo Yuen v. INS, supra*, 456 F.2d at 1108 ("His lack of family ties in the United States is alone ground for denial of adjustment of status.").

Chan contends that the second adverse factor—that as a crewman he had deserted his vessel while in the United States in 1968 and remained here illegally under a different name until his departure in 1972—should not have been considered as an adverse factor and that other positive factors were improperly ignored by the Board. We have already rejected Chan's claim that the Board erred in finding that Chan deserted his ship. Therefore, Chan's argument that an adverse inference cannot be drawn from "mere overstaying" is irrelevant. Chan's desertion is a factor separate and apart from merely overstaying a visa.[9] As for Chan's use of a different name,[10] this was clearly not the key point of the Board's finding but, linked to Chan's desertion and four-year illegal stay in the United States, there is some evidence of improper purpose in the use of the name. Chan's reliance on *United States ex rel. Leibowitz v. Schlotfeldt*, 94 F.2d 263 (2d Cir. 1938), is therefore inappropriate.

Finally, Chan claims that his length of residence in the United States and his labor certification should have been considered as favorable factors. The immigration authorities have labored for over seven years to carry out the mandate committed to them by Congress as it pertains to Chan. Now this delay is being urged as a further ground for granting Chan the extraordinary relief he seeks. We think such a bootstrap argument is meritless. It merely highlights the sluggishness of all institutions of government including the courts, in effectuating the policy decision made by Congress. It is no more a ground for keeping Chan in this country than is his cooking

**9.** Moreover, Chan's citation of *Marino v. INS*, 537 F.2d 686 (2d Cir. 1976), fails to convince us that mere overstaying can never be used as an adverse factor. In *Marino*, an alien who admitted his deportability as an overstay visitor petitioned the immigration authorities for adjustment of status. After initially granting the alien's petition, the immigration judge reversed his decision when further evidence indicated that the alien had "been convicted of a crime involving moral turpitude," making him an excludable alien under Section 212(a)(9) of the Immigration and Nationality Act and statutorily ineligible for adjustment of status under Section 245(a). 8 U.S.C. §§ 1182(a)(9), 1255(a) (1976). In reviewing the case, the Second Circuit determined that the alien had not been "convicted" of a crime within the meaning of the Act. Therefore, the court held that the alien should have been found statutorily eligible for Section 245 relief and remanded the case for the Attorney General to exercise his discretion in the matter. The court noted that "Marino was entitled to apply for adjustment of status to that of a permanent resident even though he had overstayed his visit." 537 F.2d at 693 n.9. But nowhere does the court say that overstaying his visit cannot be considered as an adverse factor by the Attorney General in the exercise of discretion, and the case does not stand for that proposition. Rather, as the court continued, it simply means that "[i]f Marino's application for adjustment of status were granted in the Attorney General's discretion, his deportability for having overstayed his visit would be wiped out." *Id.* (citation omitted).

**10.** Chan admits that he used the name "Chow Wing Ting" on immigration papers when he departed the United States in 1972, but claims that it is a phonetic spelling of "Chan, Wing Ding."

talent, which the immigration judge found was acquired while Chan was illegally in the United States.[11]

Congress is the body charged with establishing our nation's policies pertaining to the entry of aliens and their right to remain here. "[T]hat the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government." *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954); *accord, Kleindienst v. Mandel*, 408 U.S. 753, 766–67, 92 S.Ct. 2576, 2583–2584, 33 L.Ed.2d 683 (1972). In the Immigration and Nationality Act, Congress gave discretionary authority to the Attorney General to make adjustment of status determinations. The determination in Chan's case is adequately substantiated by the record and properly reasoned in its analysis. All parties concerned should be uncomfortable that the fulfillment of Congress' policy has proceeded at such a deliberate pace.

*Affirmed.*

---

11. The immigration judge found that "[t]he labor certification in support of [Chan's] application was granted on the basis of experience gained solely while unlawfully in the United States. No experience as a cook was gained abroad prior to his entry into the United States." Rec. 54. A subsequent affidavit suggests Chan may have had some prior cooking experience, but it fails to persuade us that the Board erred in not treating the labor certification as a positive factor.