**YANG Cheng Huan, Petitioner,**

v.

**William J. CARROLL, District Director of the United States Immigration and Naturalization Service, Washington District, and David L. Milhollan, Director of the Executive Office for Immigration Review and Chairman of the Board of Immigration Appeals, Respondents.**

No. 1:93cv1411.

United States District Court,
E.D. Virginia.

May 17, 1994.

Mary Ita Snyder, Pettit & Martin, Washington, DC, for petitioner.

Helen Fahey, U.S. Atty., Theresa Carroll Buchanan, Asst. U.S. Atty., Alexandria, VA, Kristin A. Cabral, David M. McConnell, Lauri Steven Filppu, Office of Immigration Litigation, Civil Div., U.S. Dept. of Justice, Washington, DC, for respondents.

## *MEMORANDUM OPINION*

ELLIS, District Judge.

### I.

This asylum petition is another of a growing number of petitions filed by individuals who fled the People's Republic of China ("PRC") aboard the vessel *Golden Venture.* It purports to present the question whether aliens who have a well-founded fear that they will be arrested and jailed because they refuse to obey their country's coercive population control policies may be granted asylum on the basis of persecution either on account of political opinion or membership in a partic-

ular social group. 8 U.S.C. § 1101(a)(42)(A) (hereafter "the Act"). Both the immigration judge ("IJ") and Board of Immigration Appeals ("BIA"), relying in part on *Matter of Chang,* Int.Dec. 3107 (BIA 1989), concluded that petitioner could not establish statutory eligibility for asylum based on opposition to the PRC's family planning practices. This reliance on *Chang* runs counter to this Court's ruling in *Guo Chun Di v. Carroll,* 842 F.Supp. 858 (E.D.Va.1994), which held that an applicant's expression of his or her opposition to a country's coercive population control measures may constitute a "political opinion" within the meaning of § 1101(a)(42)(A), and therefore may, when combined with facts indicating that an applicant has a particularized, well-founded fear of persecution based on the expression of this political opinion, establish eligibility for asylum.

But *Guo Chun Di* also makes clear that each habeas petition must be carefully examined, for without such meticulous factual scrutiny, courts run the risk of purporting to engage in the judicial task of statutory interpretation while in fact making "immigration decisions based on [their] own implicit approval or disapproval of U.S. foreign policy and the actions of other nations." *M.A. A26851062 v. I.N.S.,* 899 F.2d 304, 313 (4th Cir.1990) (en banc). Meticulous factual scrutiny of this record makes clear that petitioner's asylum claim is governed by neither *Guo Chun Di* nor *Chang.* It is instead governed by the uncontroversial principle that fear of prosecution under a generally applicable criminal law is not an appropriate basis for asylum. Here, petitioner's well-founded fear is not of persecution for any political opinion, but rather of prosecution for an assault only

indirectly related to petitioner's opposition to the PRC's coercive population control policies.

## II.

### A. Petitioner's History

Petitioner Yang Cheng Huan, a twenty-six year old PRC citizen, fled the PRC on board the vessel *Golden Venture,* which ran aground in New York Harbor in June 6, 1993. Once petitioner was rescued and brought to shore,[1] the Immigration and Naturalization Service ("INS") charged petitioner with attempting to enter the United States without a proper visa. After being interrogated at INS offices in Manhattan, petitioner was transferred to a detention facility in Winchester, Virginia pending completion of INS proceedings against him.

At a hearing before an IJ in Arlington, Virginia, petitioner recounted the circumstances leading to his decision to flee the PRC.[2] Petitioner is a native of the village of Mawei, a suburb of the city of Fuzhou. Before fleeing the PRC, petitioner operated a small clothing store in the village. In November, 1989, petitioner and his wife had their first child, a girl. Two years later, petitioner's wife became pregnant with the couple's second child, thereby violating the PRC's "one couple/one child" policy. In January 1992, after spending several months in hiding to avoid detection by local family planning officials, petitioner's wife gave birth to a son. Within a month of the child's birth, local family planning officials demanded that petitioner pay a fine for having a second child.[3] Petitioner did not immediately pay the fine, and at some point, local officials

---

**1.** There is some uncertainty whether petitioner "entered" the United States within the meaning of the Act. *See In the Matter of Yang, Cheng Huan,* (A72 769 139), Written Dec. and Order of the Immigration Judge, at 3 (Aug. 17, 1993). A determination of whether petitioner "entered" the United States affects whether petitioner is entitled to deportation proceedings, or merely exclusion proceedings. The difference between the two is "significant," as "a person who is deemed to have already 'entered' the country ... is subject to a deportation proceeding in which he or she enjoys greater rights than one who has not entered the country." *Dhine v. Slattery,* 3 F.3d 613, 617 (2d Cir.1993), citing *Sale v. Hai-*

*tian Ctrs Council, Inc.,* —— U.S. ——, 113 S.Ct. 2549, 2560–61, 125 L.Ed.2d 128 (1993). Counsel for petitioner has conceded that petitioner is only entitled to exclusion proceedings. In any event, this question need not be resolved in order to decide the issues presented by the petition.

**2.** Petitioner neither reads nor writes English. He testified through translators fluent in his native Chinese dialect of Foo Chow.

**3.** The amount of the fine was 3000 renmibi, an amount roughly equivalent to $361 in U.S. dollars under current exchange rates.

removed the front door of petitioner's house. The door was apparently returned after petitioner, with financial assistance from relatives, paid the fine.

In addition to levying the fine, officials ordered that either petitioner or his wife report to a local hospital for sterilization. Pursuant to this order, local family planning officials forced petitioner's wife into a car and took her to Mianjian Hospital, where she was involuntarily sterilized.[4] When petitioner arrived at the hospital, he became involved in a confrontation with a local family planning official. The confrontation escalated into a tussle during which petitioner pushed the official to the ground, breaking the official's glasses. After being told that this assault violated several criminal laws, petitioner was threatened with arrest and imprisonment.

Following the confrontation, local government officials went to petitioner's home and threatened to arrest him for the assault. To avoid arrest and possible imprisonment, petitioner, his wife, and their two small children fled their home.[5] While in hiding, petitioner learned from relatives and friends in Mawei that government officials were continuing to search for him. Petitioner was also told that government officials had destroyed his house, though whether this actually occurred is unclear. Based on the nature and duration of the threats made against him, petitioner believed he would be imprisoned if he remained in the PRC. To avoid imprisonment, petitioner paid approximately ten thousand dollars ($10,000) to secure passage to the United States aboard the *Golden Venture*.

### B. *Proceedings to Date*

Despite crediting as truthful petitioner's account of the events leading to his departure from the PRC[6], the IJ concluded that petitioner (1) had failed to demonstrate that

he possessed "an immutable trait or belief ... of adverse interest to a potential persecutor in the PRC" and therefore was "not a refugee" within the meaning of the Act, (2) *a fortiori* could not meet the more stringent clear probability standard required for withholding of deportation, and (3) was therefore subject to exclusion and deportation. *See In the Matter of Yang, Cheng Huan*, A72 762 139, Written Dec. and Order of the Immigration Judge, at 11–12 (Aug. 17, 1993).

The IJ noted that "[o]nly insofar as he [petitioner] may be a member of a particular social group, i.e., relatives of those who have been harmed by the family planning policy, is there any arguable basis for the [petitioner's] claim that he was persecuted in China or faces a reasonable possibility thereof on account of that policy." *Matter of Yang, Cheng Huan*, at 9. In ultimately rejecting petitioner's claim of persecution based on social group membership, the IJ cited *Matter of Chang* for the proposition that:

> [W]e do not find that the "one couple, one child" policy of the Chinese government is on its face persecutive.... There is no evidence that the goal of China's policy, [to control population growth] is other than stated, or that it is a subterfuge for persecuting any portion of the Chinese citizenry on account of one of the reasons enumerated in section 101(a)(42)(A) of the Act.

*Id.* at 9, quoting *Matter of Chang*, Int.Dec. 3107 (BIA 1989). Yet, the IJ noted that his decision "was not exclusively attributable" to the BIA's finding in *Chang*, but rather was based on petitioner's "own evidence of the universal applicability of the family planning policy, and his own failure to produce evidence of this discriminatory application to select groups and individuals." *Matter of Yang, Cheng Huan*, at 9–10. The IJ deter-

---

**4.** A sterilization notice produced by petitioner indicates that tubal ligation was the sterilization method used.

**5.** Initially, the family went into hiding with the family of petitioner's wife. Petitioner, his wife, and their son eventually fled to the city of Fuzhou, while petitioner's daughter was left in the care of his wife's family.

**6.** The IJ noted that "[t]he applicant gave a forthright account of his claim of persecution and

manner of arrival in this country. His testimony is worthy of credence." *In the Matter of Yang, Cheng Huan*, at 4. Petitioner's credibility is significant because an applicant's testimony, if credible in light of general conditions in the applicant's country of nationality or last habitual residence, may satisfy the burden of proof in asylum proceedings without further corroboration. 8 C.F.R. § 208.13(a) (1993).

mined that there was no evidence that petitioner had ever expressed a political opinion against the PRC's birth control policies.[7] Next, the IJ concluded that petitioner feared criminal prosecution for assaulting a government official, not persecution for his views regarding the PRC's family planning practices. *Id.* at 10. Finally, the IJ rejected petitioner's contention that he would be persecuted, if returned to the PRC, for having left the country without government permission. Pursuant to these findings, the IJ denied petitioner's application for asylum and ordered that petitioner be excluded and deported from the United States.

■ On appeal, the BIA affirmed the IJ's decision and concluded that (1) petitioner feared prosecution, not persecution, if returned to the PRC,[8] (2) petitioner did not hold a political opinion within the meaning of § 1101(a)(42)(A)[9], and (3) petitioner was not a member of a particular social group targeted for persecution within the meaning of the

Act. The BIA further determined that the IJ had not ignored petitioner's assertions regarding PRC citizens who were punished for violating PRC travel restrictions while seeking asylum abroad. *Id.* Accordingly, the BIA dismissed petitioner's appeal.

Petitioner now seeks habeas relief, and requests the issuance of an order vacating the IJ's and BIA's orders and declaring petitioner statutorily eligible for asylum.[10]

### III.

■ To be eligible for asylum, an alien must be statutorily classified as a "refugee" under 8 U.S.C. § 1158(a). *Huaman–Cornelio v. Board of Immigration Appeals,* 979 F.2d 995, 999 (4th Cir.1992). A refugee is any person who is unable or unwilling to return to his or her country because of persecution or a well-founded fear of persecution[11] on account of race, nationality, mem-

---

7. In so doing, the IJ pointed out that there was no evidence that petitioner had been labeled as "subversive," and no evidence that opposition to family planning policies had been generally deemed a "counterrevolutionary offense."

8. In particular, the BIA rejected petitioner's assertion that the IJ had ignored the destruction of petitioner's home. *See In Re Cheng, Huan Yang,* (BIA Oct. 27, 1993) at 3. There is conflicting evidence on this issue. At one point, petitioner indicated that government officials destroyed his house. Yet, other portions of petitioner's testimony seemingly suggest that government officials merely took the door from petitioner's home when he failed to pay the fine, but returned it once the fine was paid.

Petitioner contends that the BIA improperly substituted its judgment for that of the IJ in characterizing petitioner's testimony on this point as "apparent exaggeration." The IJ found petitioner's testimony generally credible, and an initial finding of credibility by an IJ is entitled to deference. *See Wing Ding Chan v. I.N.S.,* 631 F.2d 978, 982 (D.C.Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1371, 67 L.Ed.2d 349 (1981); *Vasquez–Mondragon v. I.N.S.,* 560 F.2d 1225 (5th Cir.1977). While it is true that the BIA pointed to conflicting testimony regarding the destruction of petitioner's house in questioning petitioner's credibility, the BIA ultimately did not disturb the IJ's determination that petitioner's testimony was credible. In any event, the BIA's determination regarding the alleged destruction of petitioner's home is not material to the disposition of this case.

9. With essentially no discussion, the BIA rejected petitioner's assertions that *Matter of Chang* had been overruled by a series of interim regulations and Executive Orders and emphasized that *Chang* remained in force and served as controlling precedent. In reaching this decision, the BIA relied chiefly on 8 C.F.R. § 3.1(g), which states that "[e]xcept as they may be modified or overruled by the Board or the Attorney General, decisions of the Board shall be binding on all officers and employees of the Service or Immigration Judges in the administration of the Act, and selected decisions designated by the Board shall serve as precedents in all proceedings involving the same issue or issues." 8 C.F.R. § 3.1(g) (1993).

10. An order previously entered by another judge of this division stayed proceedings against petitioner pending disposition of this habeas petition.

11. An individual may seek asylum based on either past persecution or a well-founded fear of future persecution. 8 C.F.R. § 208.13(b) provides, in pertinent part:

(1) *Past persecution.* An applicant shall be found to be a refugee on the basis of past persecution if he can establish that he has suffered persecution in the past in his country of nationality of last habitual residence on account of race, religion, nationality, membership in a particular social group. or political opinion, and that he us unable or unwilling to return to or avail himself of the protection of that country owing to such persecution.

. . . .

bership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A) (1993); see *M.A. A26851062 v. I.N.S.*, 899 F.2d 304, 307 (4th Cir.1990) (en banc). Yet, a generalized fear of persecution is not sufficient to establish eligibility for asylum. See, e.g., *Huaman–Cornelio*, 979 F.2d at 1000. Rather, an individual seeking asylum must show (i) that a reasonable person in the circumstances would fear persecution if he or she were returned to his or her native country and (ii) that the fear has "some basis in the reality of the circumstances" and is validated with "specific, concrete facts." *Id.* at 999–1000, citing *M.A.*, 899 F.2d at 311 (citations omitted). Thus, to establish eligibility for asylum, petitioner must show that he suffered past persecution, or fears future persecution, on the basis of his political opinion or social group membership.

Petitioner contended before the BIA that he had a well-founded fear of persecution based both on his political opposition to the PRC's coercive family planning practices and on his membership in a social group consisting of PRC citizens with more than one child. The BIA rejected these contentions, finding (1) that petitioner feared criminal prosecution, not persecution for either a political opinion or membership in a particular social group, (2) that petitioner's views regarding the PRC's coercive population control policies did not constitute a "political opinion" within the meaning of the Act, and (3) that petitioner is not a member of a social group within the meaning of the Act. Each of these is separately addressed.

■ The BIA's factual determination that petitioner genuinely fears prosecution for a criminal assault rather than persecution must be upheld if it is supported by substantial evidence from the record as a whole. *I.N.S. v. Elias–Zacarias*, —— U.S. ——, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992). Accordingly, the BIA's determination will be reversed only if the evidence presented by petitioner is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Huaman–Cornelio*, 979 F.2d at 999, quoting *Elias–Zacarias*, —— U.S. at ——, 112 S.Ct. at 817.

### A. Prosecution for A Criminal Act

■ Substantial record evidence supports the BIA's conclusion that petitioner has a well-founded fear of criminal prosecution, not persecution. First, the record indicates that petitioner's assault of a local family planning official and his initial refusal to pay the fine imposed for having a second child, acts petitioner now characterizes as acts of political dissent, were not directly related to petitioner's opposition to coercive family planning practices. Petitioner concedes that the assault on the official was motivated not by his opposition to the PRC's family planning practices, but rather by his anger over the brutal treatment of his wife. While refusing to pay a fine may amount to political dissent in some circumstances, it does not do so here. By his own declaration, petitioner did not immediately pay the fine because he did not have enough money to do so. The fine was paid once petitioner borrowed money from friends and relatives. Finally, it appears

(2) *Well-founded fear of persecution.* An applicant shall be found to have a well-founded fear of persecution if he can establish first, that he has a fear of persecution in his country of nationality or last habitual residence on account of race, religion, nationality, membership in a particular social group, or political opinion, second, that there is a reasonable possibility of actually suffering such persecution if he were to return to or avail himself of the protection of that country because of such fear.

While the Fourth Circuit has not defined "persecution" under the Act, several other circuits have. Thus, "persecution" has been defined as punishment or the infliction of harm for political, religious, or other reasons "that this country does not recognize as legitimate." *De Souza v. I.N.S.*, 999 F.2d 1156, 1158 (7th Cir.1993), citing

*Osaghae v. I.N.S.*, 942 F.2d 1160, 1163 (7th Cir. 1991). And "persecution" has been further defined as "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive" and which entails "more than just restrictions or threats to life and liberty." *Nguyen v. I.N.S.*, 991 F.2d 621, 625 (10th Cir.1993), quoting *Zalega v. I.N.S.*, 916 F.2d 1257, 1260 (7th Cir.1990) (quoting *Desir v. Ilchert*, 840 F.2d 723, 726 (9th Cir. 1988)). In essence, "persecution" under the Act occurs when an individual is punished or harmed, based on that individual's race, religion, nationality, membership in a particular social group, or political opinion, in a way that involves particularly egregious threats to, or deprivations of, life or liberty.

that petitioner's decision to leave the PRC was at least partially motivated by economics, for his declaration reveals that petitioner's decision to leave the PRC was based in part on the fact that his family had little income after petitioner sold his store in Mawei. He argues that his economic concerns were by-products of the government's threats against him for his opposition to coercive family planning practices, and therefore support his asylum claim. *See Osorio v. I.N.S.*, 18 F.3d 1017, 1028–1029 (2d Cir. 1994).[12] But this argument relies on a series of inferences about petitioner's behavior and motivations, and where, as here, a reasonable factfinder could easily draw a different set of inferences, the factfinder's determination is entitled to deference. *See Elias–Zacarias*, —— U.S. at ——, 112 S.Ct. at 817 (indicating that the BIA's determination should be reversed only if the evidence is so compelling that no reasonable factfinder could fail to find the requisite fear of persecution).

■ Plaintiff further contends that officials continued to pursue him even after he was technically in compliance with family planning regulations because of his opposition to local family planning practices. Yet,

the record points persuasively in another direction; it indicates that officials continued to pursue petitioner because of his assault on a government official, an act which local officials informed petitioner was criminal.[13] Punishment for violation of a generally applicable criminal law is not persecution and "does not implicate any grounds for asylum." *El Balguiti v. I.N.S.*, 5 F.3d 1135, 1136 (8th Cir.1993).[14] The fact that local officials may have had additional, personal motives for harassing petitioner does not convert petitioner's fear of prosecution into a fear of persecution. *See, e.g., Huaman–Cornelio*, 979 F.2d at 1000 ("Even aliens with a well-founded fear of persecution supported by concrete facts are not eligible for asylum if those facts indicate only that the alien fears retribution over purely personal matters.").

■ Yet, a determination that petitioner fears prosecution rather than persecution does not end the Court's inquiry. Not addressed by either the IJ or the BIA is petitioner's contention that criminal prosecution may, under certain circumstances, amount to persecution. Here, petitioner may show that his criminal prosecution amounted to perse-

**12.** Petitioner's economic concerns are not irrelevant to his asylum claim for, as the Second Circuit recently recognized, "the conclusion that a cause of persecution is economic does not necessarily imply that there cannot exist other causes of the persecution.... what appears at first sight to be primarily an economic motive for departure may in reality also involve a political element, and it may be the political opinions of the individual that expose him to serious consequences, rather than his objections to the economic measures themselves." *Osorio*, 18 F.3d at 1028–1029, citing U.N. High Commissioner for Refugees', *Handbook on Procedures and Criteria for Determining Refugee Status* ¶¶ 62–64 (holding, in case of Guatemalan union leader, that "any attempt to unravel economic from political motives is untenable").

**13.** During hearings before the IJ, there were several exchanges regarding officials' continued pursuit of petitioner after he was technically in compliance with local family planning regulations. At one point, petitioner testified:
Q. And what did you do next [after fleeing Mawei]?
A. My brother was ... thought if ... if I help ... if my brother help me pay the money then official won't come to my house again, so my brother get from the friend, borrow some money and pay for the 3,000 Chinese money. The offi-

cial tell my brother even you pay the money, the official still had to look for me and put me in jail.
Q. Why were they still looking for you?
A. Because in the hospital ... I hit the official in the hospital.
And at another point petitioner indicated:
Q. Did ... these officials come and visit you at your house after this [sterilization] operation had taken place?
A. Yes. They did.
Q. Why ... why do you think they came after the operation?
A. It happen because I pushed the official down on the floor and he ... because he wear glasses and he broke his glasses. That's what he say, because I assault the official, so that's why they came to my house and want to arrest me.

**14.** *See Saleh v. United States Dept. of Justice*, 962 F.2d 234, 239 (2d Cir.1992) (Yemeni Muslim convicted of manslaughter in United States could be deported despite fact that he had been convicted in absentia in Yemen and faced a death penalty); *see also* U.N. High Commissioner for Refugees', *Handbook on Procedures and Criteria for Determining Refugee Status*, ch. II, ¶ 56 (1979) ("[P]ersecution must be distinguished from punishment for a common law offense.... It should be recalled that a refugee is a victim or potential victim—of injustice, not a fugitive from justice.").

cution by demonstrating (1) that his crime was political in nature, (2) that he did not receive a fair trial before being punished,[15] or (3) that the PRC government had an improper motive for pursuing his conviction. *Behzadpour v. United States*, 946 F.2d 1351, 1353 (8th Cir.1991); *see Mabugat v. I.N.S.*, 937 F.2d 426, 429 (9th Cir.1991). In addition, prosecution for a criminal act may amount to persecution where "a disproportionately severe punishment would result on account of one of the five grounds enumerated in the Act." *Abedini v. I.N.S.*, 971 F.2d 188, 191 (9th Cir.1992). Significantly, such punishment must be either "especially unconscionable" or "merely a pretext" to persecute an individual for his "beliefs or characteristics." *Id.* at 191.

■ The facts at bar do not fit these principles. While the underlying predicate for petitioner's criminal act was arguably political, the actual assault was not. Further, petitioner fails to show that officials improperly used the assault as pretext to arrest him because of his opposition to coercive family planning practices. Finally, no credible record evidence indicates that any punishment imposed on petitioner as a result of an assault conviction in the PRC would be "especially unconscionable."

■ Petitioner further argues that he faces "persecution" if forced to return to the PRC due to his illegal departure from the country. *See Coriolan v. I.N.S.*, 559 F.2d 993, 1000 (5th Cir.1977) (indicating that under certain factual circumstances prosecution for illegal departure may constitute persecution on account of political opinion). Yet, petitioner's "illegal departure claim" merely asserts that petitioner fears persecution for violating PRC exit laws.[16] Punishment for violation of a fairly administered passport law does not amount to political persecution under the Act.[17] *Behzadpour*, 946 F.2d at 1353. Accordingly, petitioner has a well-founded fear of prosecution for violating PRC exit laws, as a result of his illegal departure from the PRC, not persecution under § 1101(a)(42)(A).

The determination that petitioner has a well-founded fear of criminal prosecution, not persecution, is case-dispositive and compels dismissal of the petition. *Elias–Zacarias*, —— U.S. at ——, 112 S.Ct. at 815. Yet, because the IJ and BIA addressed and rejected petitioner's other proposed grounds for asylum, so too will this opinion address petitioner's contentions (i) that opposition to the PRC's coercive family planning practices may constitute a "political opinion" and (ii) that membership in a group having more than one child in contravention of PRC family planning practices constitutes "social group" membership within the meaning of § 1101(a)(42)(A).

### B.  *Political Opinion*

The government, citing *Matter of Chang*, Int.Dec. 3107 (BIA 1989), contends that an

---

**15.** The record does not disclose what process petitioner would have received had he been arrested and tried for the assault in the PRC. In any event, the fact that the PRC may punish assault more severely than the United States does not mean that such punishment is *per se* unconscionable. Asylum is not designed to protect criminals who face harsher punishment if deported to their home countries than if permitted to remain in the United States. *Bastanipour v. I.N.S.*, 980 F.2d 1129, 1132 (7th Cir.1992) (holding that Iranian citizen who received drug trafficking sentence in United States was not entitled to asylum on sole ground that his crime would be punishable by death in his native Iran). "A contrary conclusion would collapse the fundamental distinction between persecution on the one hand and prosecution of nonpolitical crimes on the other." *Id.*

**16.** In this regard, petitioner argues that the IJ gave insufficient weight to evidence indicating

that individuals who violate PRC exit laws face administrative detention, and possible incarceration. At petitioner's asylum hearing, petitioner's uncle testified:

> Q.  What ... what will happen to respondent [petitioner] if he's brought back to the ... to ... to China?
> A.  Because right now if you leave China illegally and if he was sent back to China he will put in the jail and fine like 10,000 to 15,000 Chinese money and he have to ... also have to be put in the jail.

**17.** The BIA acknowledged that returnees to the PRC may face penalties, but noted that, "the pertinent background material contains no evidence that the PRC sought to punish these individuals on account of one of the protected grounds." *In Re Cheng, Yang Huan*, (BIA Oct. 27, 1993) at 3.

individual's views regarding a nation's coercive family planning practices cannot constitute a political opinion within the meaning of the Act.[18] But as this Court noted in *Guo Chun Di*, "there can be little doubt" that § 1101(a)(42)(A) "encompasses an individual's views regarding procreation," as the right to bear children is "one of the basic civil rights of man." *Guo Chun Di v. Carroll*, 842 F.Supp. 858, 872 (E.D.Va.1994), citing *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). Equally free of doubt is that involuntary or coerced sterilization is an egregious infringement upon this fundamental right.[19] And opposition to governmental infringement of fundamental rights is nothing if not a political opinion or position.

▮▮▮▮ Yet, in order to establish asylum eligibility, petitioner must show that he made an "overt manifestation" of this political opinion. *See De Valle v. I.N.S.*, 901 F.2d 787, 791 (9th Cir.1990), citing *Bolanos–Hernandez v. I.N.S.*, 767 F.2d 1277, 1287 (9th Cir.1984).[20] Petitioner expressed his opposition to coercive family planning policies by having a

second child and refusing to submit to sterilization. He therefore arguably manifested a "political opinion" within the meaning of § 1101(a)(42)(A). *See, e.g., Guo Chun Di*, 842 F.Supp. at 873–74.[21]

### C. *Social Group Membership*

▮▮▮ Less clear is whether petitioner, who had a second child in violation of the PRC's population control policies, is a member of a "social group" within the meaning of § 1101(a)(42)(A). While the term "social group" is not defined in the Act, at least one court has described social groups as "discrete, homogenous groups targeted for persecution because of assumed disloyalty to the regime." *Bastanipour v. I.N.S.*, 980 F.2d 1129, 1132 (7th Cir.1992). Other courts have used the definition of "social group" provided by the United Nations High Commissioner for Refugees:

A "particular social group" normally comprises persons of similar background, habit or social status.... Membership of [sic] such a particular social group may be at

**18.** The IJ, in rejecting petitioner's contention that his views regarding the PRC's coercive family planning practices constituted a "political opinion" under the Act, noted that there was no evidence that the PRC's population control policies were either "manifestations of Communist political doctrine" or "used as a means to enforce political conformity." But, as this Court noted in *Guo Chun Di*, nothing in the Act precludes asylum for aliens persecuted because of their political opposition to uniformly applied government policies, regardless of the ideology behind such policies. Indeed, *Guo Chun Di* explicitly notes that citizens who have been persecuted by the "uniformly applied" policies of totalitarian states such as Cuba and the former Soviet Union have always been beneficiaries of asylum under the Act. Nor is it relevant under the Act whether or not the PRC's coercive family planning laws and policies, including involuntary sterilization, are "manifestations of Communist political doctrine." The Act does not single out Communist ideology, or any other ideology; it wisely recognizes that policies and laws obnoxious to fundamental human rights and liberties may issue from totalitarian or authoritarian regimes of the right as well as the left.

**19.** As Justice Douglas noted in *Skinner:*
[t]he power to sterilize, if exercised, may have subtle, far-reaching and devastating effects. In evil or reckless hands, it can cause races or types which are inimical to the dominant

group to wither and disappear. There is no redemption for the individual whom the law touches. Any experiment which the State conducts is to his irreparable injury. He is forever deprived of a basic liberty.
*Skinner*, 316 U.S. at 541, 62 S.Ct. at 1113. Intrusions upon this basic liberty are looked upon with disfavor. *See Carey v. Population Services Int'l.*, 431 U.S. 678, 687, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977) ("[t]he teaching of *Griswold* is that the Constitution protects individual decisions in matters of childbearing from unjustified intrusion by the State.").

**20.** An individual makes an overt manifestation of a political opinion within the meaning of § 1101(a)(42)(A) when:

(i) there is a significant relationship between the victim and the persecutor;
(ii) the individual has engaged in sufficiently conscious and deliberate decisions or acts which attribute certain political opinions to that individual; or,
(iii) the individual shows that there has been some "specific effort" or persecution aimed at them on account of their political beliefs.
*De Valle*, 901 F.2d at 791 (citations omitted).

**21.** To the extent that the IJ and BIA relied on *Matter of Chang*, Int.Dec. 3107 (BIA 1989) in concluding otherwise, such reliance, in the Court's view, is mistaken.

the root of persecution because there is no confidence in the group's loyalty to the Government or because the political outlook, antecedents, or economic activity of its members, or the very existence of the social group as such, is held the be an obstacle to the Government's policies.

*Handbook on Procedures and Criteria for Determining Refugee Status,* ¶¶ 77–78; *see Ananeh–Firempong v. I.N.S.,* 766 F.2d 621, 626 (1st Cir.1985).[22] And "social group persecution" is persecution based on "a characteristic that either is beyond the power of an individual to change or is so fundamental to individual identity or conscience that it ought not be required to be changed." *Ananeh–Firempong,* 766 F.2d at 626.

■ Petitioner's argument that he faces persecution as a member of a social group consisting of PRC families having more than one child is not without some appeal. The existence of couples having more than one child is clearly contrary to the PRC's goal of "one couple/one child." [23] Further, local government planning officials demanded the involuntary sterilization of petitioner's wife, and evidence regarding the treatment of one's family may be probative regarding a potential persecution based on social group membership. *See Ananeh,* 766 F.2d at 627. Finally, once petitioner fathered a second child, the existence of the second child was a "condition" beyond petitioner's power to change.

■ Yet the term "social group" under § 1101(a)(42)(A) "cannot be without some outer limit." *Sanchez–Trujillo v. I.N.S.,* 801 F.2d 1571, 1576 (9th Cir.1986). In evaluating purported social group membership courts should take care, based on the facts of each asylum application, to distinguish between particular social groups and "mere demographic divisions." *See Sanchez–Trujillo,* 801 F.2d at 1576 n. 7.[24] On the facts of this case, PRC families with more than one child are more appropriately characterized as a demographic division than as a social group. First, it appears that couples in the PRC who have more than one child are simply not a homogenous and discrete group. Different population control policies are in effect in different regions of the PRC. *See United States Department of State, Country Reports*

---

**22.** The First Circuit noted in *Ananeh–Firempong,* "[t]he Handbook has been treated by the [Board] as a significant source of guidance with respect to the United Nations Protocol." *Id.* at 626, quoting *Zavala–Bonilla v. I.N.S.,* 730 F.2d 562, 567 (9th Cir.1984).

**23.** The existence of families having more than one child is viewed as perhaps the most serious obstacle to the PRC's population control policies. Couples who adhere to the "one couple, one child" policy receive benefits including monthly stipends and preferential medical, food, and educational benefits. *See* United States Dep't of State, *Country Reports on Human Rights Practices for 1992* (China) (1993). Couples failing to limit their family to one child face penalties, including monetary fines, withholding of social services, demotion, loss of employment, and destruction of personal property. *Id.* And, as the facts at bar and in related cases reveal, some couples having more than one child face imprisonment and involuntary sterilization. Finally, refusal "to control fertility or encourage others to refuse is sometimes treated as an offense against the state." Judith Banister, *China's Changing Population* (1987).

**24.** In *Sanchez–Trujillo,* the Ninth Circuit indicated that "[p]erhaps a prototypical example of a 'particular social group' would consist of the immediate members of a certain family, the family being a focus of fundamental affiliation concerns and common interests for most people." *Sanchez–Trujillo,* 801 F.2d at 1576; *see Hernandez–Ortiz v. I.N.S.,* 777 F.2d 509, 514–16 (9th Cir.1985) (holding that an asylum applicant from El Salvador demonstrated a well-founded fear of persecution through evidence that her family had been subject to a series of violent attacks and threats). Yet, the *Sanchez–Trujillo* court distinguished between "small, readily identifiable" family units singled out for particularized persecution and social groups that, although members may have characteristics that put them at greater risk of persecution than the general population, nonetheless are not the sort of "cohesive, homogenous group" contemplated as a social group within the meaning of the Act. *Sanchez–Trujillo,* 801 F.2d at 1576; *see Estrada–Posadas v. I.N.S.,* 924 F.2d 916, 919 (9th Cir.1991) (indicating that "[i]f Congress had intended to grant refugee status on account of "family membership," it would have said so"). Petitioner's purported social group consisting of all PRC families having more than one child in contravention of restrictive family planning policies is more comparable to a "sweeping demographic division" with "a plethora of different lifestyles, varying interests, diverse cultures and contrary political leanings" that "will rarely, if ever, constitute a distinct 'social group' for the purposes of establishing refugee status." *Sanchez–Trujillo,* 801 F.2d at 1576–77.

*on Human Rights Practices for 1992* (China) (1993).[25] And the PRC government imposes different population control policies on different ethnic groups in the country. *Id.* (indicating that ethnic minorities in the PRC are subject to less stringent population controls than the majority Han population). Further, not all families in the PRC who have more than one child do so for political reasons. Petitioner's argument, if accepted, would mean that couples having more than one child due to a failure of their chosen birth control method would automatically be deemed politically opposed to the PRC's one couple/one child policy. Likewise, a couple having twins or some other multiple birth would have a political opinion imputed to them. Neither of these scenarios involves the manifestation or expression of a political opinion, or indicates that the individuals involved belong to a discrete and homogenous group. Finally, accepting petitioner's interpretation of "social group" would require courts to become involved in foreign and social policy debates that are properly the province of the political branches of government. *See M.A. 26851062 v. I.N.S.,* 899 F.2d 304, 313 (4th Cir.1990) (en banc).[26]

### IV.

The substantial record evidence, taken as a whole, supports the BIA's determination that petitioner fears prosecution based on his assault of a local government official, rather than persecution based on one of the five grounds enumerated at § 1101(a)(42)(A).[27]

**25.** The PRC's coercive population control measures most severely affect Han Chinese living in urban areas, with numerous exceptions allowed for the 70% of Han Chinese who live in rural areas. Conceivably, then, an urban family with more than one child might be considered part of a "particular social group" within the meaning of § 1101(a)(42)(A) while a rural family would not.

**26.** In *M.A.,* the Fourth Circuit indicated that accepting broad claims for asylum based on a well-founded fear of persecution:

> would transform the political asylum process from a method of individual sanctuary left largely to the political branches into a vehicle for foreign policy debates in the courts.... [t]he federal courts lack the expertise, and, more importantly, the constitutional authority,

Thus, the determinations of the IJ and BIA that petitioner does not satisfy the requirements for statutory asylum must be upheld.

An appropriate Order dismissing the petition shall issue.

> to assume such a role.... We thus reject petitioner's invitation to join the political branches in the articulation of foreign policy under the rubric of discerning a 'well-founded fear of persecution.'

*M.A.,* 899 F.2d at 313–14.

**27.** Because petitioner cannot make out an asylum claim based on a well-founded fear of persecution pursuant to 8 U.S.C. § 1101(a)(42)(A), there is no need to reach the question of whether petitioner meets the requirements for withholding of deportation pursuant to 8 U.S.C. § 1253(h). *See Huaman–Cornelio v. Board of Immigration Appeals,* 979 F.2d 995, 1000 (4th Cir.1992) ("The BIA's determination that petitioner did not meet the asylum standard necessarily means that petitioner did not meet his burden on the more difficult withholding of deportation claim.").